Albert Ravano v. Commissioner. Tidewater Commercial Company, Inc., a Maryland corporation v. Commissioner.
Ravano v. Commissioner
Docket Nos. 2884-65, 2885-65.
United States Tax Court
T.C. Memo 1967-170; 1967 Tax Ct. Memo LEXIS 91; 26 T.C.M. (CCH) 793; T.C.M. (RIA) 67170; August 22, 1967
Joshua W. Miles, First Nat'l Bank Bldg., Baltimore, Md., for the petitioners. Harvey I. Lapin, for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in income tax and additions to tax under section 6651(a) of the Internal Revenue Code of 1954 for failure to file returns, as follows: Sec.
6651(a)
Petitioner
Year
Deficiency
Addition
Tidewater Commer-
cial Company, Inc.
1955
$ 5,211.25
1956
$ 5,137.52
1958
87,848.99
$21,302.92
1959
1,686.02
1960
666.23
1961
581.40
Albert Ravano
1958
221,344.44
55,336.11
*92 The principal issue is whether a transfer of funds in 1958 from the Tidewater Commercial nompany, Incorporated, to its sole stockholder, Albert Ravano, was a distribution of property with respect to the corporation's stock, and as such constituted a dividend to the extent of its earnings and profits. Also at issue is whether certain portions of the operating expenses incurred by the corporation were properly disallowed by the Commissioner. Findings of Fact Albert Ravano (hereinafter referred to as Ravano), the petitioner in Docket No. 2884-65, is a citizen of Italy, and resides in Monte Carlo, Monaco. He did not file any United States income tax return for the year 1958. Ravano, together with seven of his children, is engaged in a worldwide shipping business. He operates, either directly or through various corporations, approximately 30 ocean-going freight vessels and oil tankers, most of which sail under the flags of Italy, Panama, or Liberia. Among his wholly owned corporations is the Tidewater Commercial Company, Incorporated (hereinafter sometimes referred to as Tidewater), petitioner in Docket No. 2885-65, a Maryland corporation with its principal place of business in *93 Baltimore, Maryland. Tidewater filed Federal corporate income tax returns for all the years in issue with the district director of internal revenue in Baltimore, except that it has never filed Form 1042, or any other return, reporting the payment of interest or dividends to a nonresident alien, or the withholding of any portion of such payments. Tidewater was incorporated on February 2, 1947, as the successor to another corporation, also known as the Tidewater Commercial Company, a California corporation wholly owned by Ravano. The California corporation transferred all of its assets, consisting primarily of the vessel S. S. Tidewater, in return for 5,000 shares of Tidewater's stock, which represented all the then authorized and outstanding stock of Tidewater. These assets were recorded on Tidewater's books at $143,841.19. The California corporation subsequently dissolved, leaving Ravano with 100 percent of Tidewater's stock. Ravano's other corporations appear to be based in Italy, and one of the functions of Tidewater has been to provide services for vessels in the Ravano enterprise when they are in American ports. The general manager of Tidewater, from its incorporation to the *94 present, has been Captain P. S. Saglietto ("Captain Saglietto"), a long-time, trusted employee of Ravano. From 1927 to 1939, Captain Saglietto was a sea captain on Ravano ships. During World War II, he was interned in the United States. After World War II, Captain Saglietto became a member of the Italian Technical Delegation, which purchased Liberty ships for the Italian government in the United States. When Ravano became Chairman of this Delegation in late 1946 or early 1947, Captain Saglietto requested employment once again with the Ravano family, and was appointed general manager of Tidewater. As such, Captain Saglietto was entrusted with the responsibility of managing the day-to-day affairs of Tidewater. He also kept special private accounts for the Ravano family. Ravano visits the United States at regular intervals, usually once a year, to review the operations of Tidewater. Since Tidewater is only one of many shipping corporations owned or controlled by him, and is far from his home, he entrusts the management of its ordinary affairs to Captain Saglietto. However, as sole stockholder, ultimate control over Tidewater's affairs rests in Ravano, and he has exercised such control *95 so as to make certain that Tidewater's policies conformed with the needs of the overall Ravano shipping enterprise. Tidewater is authorized by its charter to engage in all phases of the shipping business, both as a shipowner and as shipowners' agents. From its inception until 1949, it acquired a fleet of approximately six vessels, which it chartered to carry bulk cargo in international trade. These vessels were eventually sold either for scrap or to one of Ravano's foreign shipping corporations. Tidewater operated only one vessel, the S.S.A.L. Kent, from October, 1952 until November, 1956, when the ship was sold to another corporation in the Ravano organization. From November, 1956 until January, 1962, Tidewater owned no ships and engaged in no cargo carrying operations. In addition to chartering its own vessels, Tidewater has from its inception also engaged in the business of collecting and disbursing funds for other shipowners when their ships were loading or unloading in American ports. In general, a shipowner's collecting and disbursing agent acts in a supervisory capacity over the loading or unloading of his client's ships, and in a typical case, Tidewater might perform the *96 following services: (a) Instruct masters regarding loading and unloading (b) Order bunker for unloading (c) Instruct sub-agent (as fixed by terms of the ship's charter) (d) Maintain liason wich the U.S. Immigation Dept. re crew members (e) Investigate any vessel troubles for owner (F) Collect freight paid on U.S. voyages (g) Disburse sub-agent fees and other expenses relating to loading and unloading at U.S. ports (h) Disburse funds to shipowner as requested (i) Maintain books and records of collections and disbursements (j) Investigate any collisions (k) Pay any fines Tidewater has never acted as a collecting and disbursing agent for any shipowner other than Ravano or a corporation controlled by the Ravano family. It always charged a fee for its services, however, which closely approximated the fee which the shipowner would have had to pay to an uncontrolled third party. Captain Saglietto has based the fee upon charts published by the Steamship Trade Association of Baltimore, which set forth suggested tariffs to be charged for services as a collecting and disbursing agent. The suggested tariff was $200 per vessel, but Tidewater charged an additional $100 to *97 $200 because it rendered additional services beyond those usually rendered by a collecting and disbursing agent. The fee of $300-400 thus determined was normal for the port of Baltimore, where the charge for this type of service ranged from a minimum of $100 to a maximum of $425. Among the Ravano-controlled corporations for which Tidewater rendered services as collecting and disbursing agent was one known as Societa per Azioni Industria Armamento of Genova (hereinafter referred to as SAIA). During the period 1947-1956, SAIA performed similar services for Tidewater when Tidewater vessels were in the Eastern Hemisphere, collecting and disbursing funds for Tidewater's account and performing other related services. Tidewater also had a collecting and disbursing agent in London, England known as Wm. H. Muller & Co. Ltd. (hereinafter referred to as Muller), a Dutch concern doing business internationally. Muller was not owned by the Ravano family, though its directors included close friends of Ravano. It acted as collecting and disbursing agent for Tidewater with respect to charters of Tidewater vessels in the sterling area, which area, in general, consisted of the United Kingdom and *98 other countries in the British Commonwealth (other than Canada). Funds received by Muller for the account of Tidewater (mainly from a governmental institution known as Biscore, which chartered Tidewater vessels to import ore) were in "blocked account" sterling; under regulations of the Bank of England, as a nonresident (i.e., one not residing within the sterling area), Tidewater could not convert pounds earned in the sterling area into dollars and bring them back to the United States. Funds in the hands of Muller could be used only to pay ship's operating expenses in the sterling area, invested in certain United Kingdom securities, or transferred to another blocked account. Although "blocked account" sterling could be sold for dollars in a so-called "free market", such as existed in Zurich, Switzerland and New York City, the sale would have to be made at a discount. The year-end balances of "blocked account" sterling held by Muller as agent for Tidewater, which included both income from charter parties and proceeds of sales of Tidewater's ships negotiated by Muller as broker, were as follows for the years 1951-1957 (in dollars): Year
Amount
1951
$ 675,584.61
1952
1,039,992,61
1953
260,253.50
1954
523,944.11
1955
658,719.57
1956
900,688.71
1957
908,251.28
*99 The unavailability of these funds in dollars further accentuated Tidewater's need for cash. Its initial capitalization, which consisted mainly of the vessel S. S. Tidewater, was not sufficient to enable it to immediately engage in the shipping business. The S. S. Tidewater itself was badly in need of repairs before it could be utilized to carry cargo, and the corporation also needed working capital to pay the expenses of operating a vessel. Funds for these purposes, as well as for the acquisition of additional ships, were needed from outside sources, and were provided through the years, as needed, either by Ravano directly or through SAIA, his controlled corporation. Ravano's first advance of $240,000, made in August 1947 for the purpose of putting the S. S. Tidewater in good repair, was recorded on Tidewater's books as a liability, in an account called "Loans Payable-A. Ravano". This initial advance was repaid before the end of the year, but additional advances left a balance due in the account in December, 1947 of $116,722.74. By this time, Tidewater had begun to charter its vessels for cargo carrying voyages around the world, and SAIA, its European agent, was collecting freight *100 revenues and disbursing funds for Tidewater's account in the Eastern Hemisphere. Since, aside from cash needed for the acquisition of additional vessels, Tidewater's major needs for funds would be for working capital, and since much of this working capital would be used by SAIA to pay Tidewater's expenses in the Eastern Hemisphere, Ravano decided to channel his loans through SAIA. Therefore, at his request, the balance in the "Loans Payable-A. Ravano" account was transferred on Tidewater's books to Tidewater's running account with SAIA, entitled "Due To/From Societa Per Azioni Industria Armamento (SAIA)" which, in addition, was used to record Tidewater's transactions as American collecting and disbursing agent for SAIA, and its earnings as collecting and disbursing agent from all of Ravano's foreign corporations, as well as transactions performed on behalf of Tidewater by SAIA. The balance owed by Tidewater, as reflected in this account, was large in the early years of Tidewater's existence, from 1947-1949, primarily because of large advances from SAIA for the acquisition of additional ships. These advances, which totaled over $1,500,000, were largely repaid by 1950, when Tidewater *101 transferred the proceeds from the sale of some of its ships back to SAIA. The balance due SAIA from 1951 on for the most part represented expenses paid for Tidewater's account by SAIA for which SAIA received no reimbursement, the funds needed by Tidewater being held by its agent Muller in "blocked account" sterling in London. The balance in this "SAIA" account was transferred to an account called "Advances from Albert Ravano" at the end of 1954, again at Ravano's request, but the change was in name only, for transactions between SAIA and Tidewater were now recorded in the "Albert Ravano" account, along with Tidewater's earnings from agency fees and advances from Ravano. The year-end balances in the account entitled "Due To/From SAIA" from 1947 to 1953, and the year-end balances in the "Advances from Albert Ravano" account from 1954 to 1957 (both accounts being referred to hereafter collectively as the "SAIA/Albert Ravano" account) were as follows: Year
Amount
1947
$ 832,878.97
1948
1,509,693.16
1949
1,300,656.67
1950
220,388.16
1951
1,031,464.55
1952
1,138,999.29
1953
415,275.72
1954
479,686.37
1955
511,735.52
1956
449,831.21
1957
604,891.29
*102 The certified public accountants who audited Tidewater's books and prepared their balance sheets and income statements at first characterized the year-end balance in the SAIA/Albert Ravano account as advances "on a current account basis" for repairs, working capital, and the acquisition of vessels. However, a note to Tidewater's balance sheet for the year ended December 31, 1949, repeated in substance every year thereafter, disclosed that the account represented "a long term investment in Tidewater * * * (by SAIA or Ravano)." By this, the auditors intended to put creditors on notice that the balance in this account was a long-term obligation of Tidewater (i.e., not payable within the coming year) which would, however, ultimately be withdrawn from the business. Also, from 1951 through 1956, Tidewater recorded on its books (as a payable) and deducted on its income tax returns one year's interest at 2 1/2 percent on the balance in the SAIA/Albert Ravano account as of February 16 of each year. None of the advances made by SAIA or Ravano were, however, evidenced by notes or other formal indicia of indebtedness, nor was any security ever given by Tidewater for the advance. The advances *103 were genuine loans, not equity capital. On December 31, 1957, Tidewater's receivable from its London agent Muller was $908,251.28, while its SAIA/Albert Ravano account showed $604,891.29 due Ravano. Tidewater had not been operating one of its own ships for over a year, and had no need for the large balance in its Muller account when functioning solely as a collecting and disbursing agent. Nor, without operating a ship of its own, was there any reasonable possibility of paying Ravano from funds generated by its current operations. On April 2, 1958, Captain Saglietto proposed to the board of directors of Tidewater (consisting of himself and two nominees of Ravano), as recorded in the minutes of the meeting of the board, that "320,000 English pounds ($903,873.48) being held by the Company's agents be transferred to Mr. Albert Ravano to liquidate the Company's indebtedness to him, the excess to be held by him at two percent interest per annum pending his advantageous purchase of a vessel for the Company's account." A resolution embodying that proposal was thereupon adopted. Since both Ravano and Tidewater had separate accounts with Muller, the transfer of funds was accomplished merely *104 by entries on Muller's books on April 28, 1958. The transaction was reflected on the books of Tidewater as a repayment in full of the $604,891.29 balance owing to Ravano, and the creation of an account receivable from Ravano of $298,982.19. Tidewater did not declare or pay any dividends on its stock until 1965. On April 28, 1958, its accumulated earnings and profits were $284,039.01. No notes or other formal indicia of debt were issued with respect to the $298,982.19 due to Tidewater from Ravano. It was the understanding of Captain Saglietto that this amount would be held "on deposit" by Ravano, available on request, pending Captain Saglietto's advantageous purchase of a vessel for Tidewater. In the meantime, Ravano was to pay two percent interest on the balance, which was in fact recognized by Tidewater as income on its books and income tax returns, and added to the amount receivable from Ravano each year from 1958 through 1961. During these years Ravano used the money received from Tidewater in connection with his various other shipping interests. He always intended to repay the funds held "on deposit" by him for the benefit of Tidewater. While operating as a shipowner, Tidewater *105 was not subject to the Maryland state income tax. The corporation did not, however, inform the State of Maryland of its cessation (in 1956) of shipping activities until December 4, 1959, when it answered an inquiry from the Comptroller of the State of Maryland as follows: Dear Sir: In reply to your inquiry under date of November 19, 1959, we wish to advise you of the following: 1. The character of our corporate activity changed from that of ship owners' (sic) and operators for 1956 and prior years, to that of ship owners' agents for the tax years 1957 and 1958. 2. Inadvertently we claimed exemption from State of Maryland income taxes for the year 1957. However, as stated in our tax returns for the years 1957 and 1958 our operations resulted in net losses. Therefore, we have no income tax liability for either of these years. 3. In the event that the character of our corporate activity should revert to its former exempt status, we will advise you accordingly. At the time this letter was written, there was no plan to acquire a vessel in the immediate future, but it was contemplated at all times that Tidewater would eventually go back into the shipping business as shipowners. *106 Captain Saglietto sought a Liberty ship for Tidewater in relatively good condition, which wouldn't require extensive repairs, but could be purchased for the approximately $300,000 which Tidewater had "on deposit" with Ravano. He purchased a ship meeting roughly these qualifications for Tidewater on or about January 5, 1962, from the Ocean Steamship Co., Ltd., in England. The purchase price of the ship was $259,000.77, and the cost of repairs and classification came to $46,802, thereby making a total cost of $305,802.77. Ten percent of the purchase price of the ship was deposited as a down payment from funds of Ravano deposited with William H. Muller & Co. Ltd., and the balance was remitted by the Banca di Roma upon Ravino's request. No amount was shown as due from Ravano on Tidewater's books at the end of 1962. There was an active and worldwide market in Liberty ships from 1956 on, and the vessel acquired by Tidewater was a standard Liberty ship, purchased at the market price. Ordinarily, it would take no more than three to five months to purchase a Liberty ship such as that which Captain Saglietto sought. However, Tidewater was without a vessel for over five years, and it was *107 almost four years from the time that Tidewater transferred its "blocked account" sterling to Ravano in April 1958, until the time a vessel was actually purchased. During the years 1957-1961, when Tidewater operated solely as a collecting and disbursing agent for Ravano's foreign shipping interests and had no vessel of its own, its only sources of income were from agency fees, interest, and gains on foreign exchange. It continued to incur, however, certain overhead expenses, such as depreciation on office equipment, insurance, etc., as well as expenses more directly related to its activities as shipping agent, such as the compensation of two clerical employees, telephone and telegraph, office supplies, etc. All of these expenses were actually incurred by Tidewater for the benefit of Tidewater, and no expense properly allocable to Ravano or one of his controlled corporations was ever deducted from Tidewater's income, either on its books or its income tax returns. Tidewater operated at a loss during each of the years from 1957 through 1961. The following schedule summarizes the sources of income and expense of Tidewater for the years 1947 through 1965, as well as the net profit (loss) *108 before taxes in each of those years (cents omitted): [1]
Gross
Gross
Profit
Receipts
(Loss)
Inter-
From
Vessel
From
Agency
est In-
Year
Vessels
Expenses
Vessel
Fees
come
1947
$ 508,996
$ 798,849
[289,853)
1948
1,891,786
1,687,503
204,282
$20,000
1949
2,071,070
1,939,417
131,653
20,000
1950
1,690,831
1,785,280
(94,448)
25,000
1951
1,153,308
901,140
252,168
25,000
1952
1,111,117
797,363
314,053
7,200
1953
854,385
790,857
63,727
8,400
$ 26
1954
499,016
499,139
(123)
10,400
1955
595,528
432,655
162,872
6,900
1956
615,137
353,676
261,460
7,800
4,667
1957
20,100
1958
18,300
5,379
1959
22,000
7,599
1960
22,050
7,607
1961
20,400
7,474
1962
274,082
320,729
(46,646)
14,000
1963
347,420
342,870
4,550
23,200
1964
407,023
381,128
25,895
18,000
339
1965
507,645
389,951
117,694
23,600
1,875
Net In-
Capital
Gen. &
come (Loss)
Gains
Inter-
Adm.
Before
and
est Ex-
Ex-
Taxes
Year
(Losses)
pense
pense *
Per Books
1947
$ 6
$27,941
[341,754)
1948
$ (4,304)
1,127
44,275
170,614
1949
(7,511)
45,147
19,297
1950
136,997
35,324
(82,799)
1951
764
49,117
207,874
1952
48,371
23,233
50,543
263,509
1953
34,713
45,783
17,944
1954
(53,623)
9,584
51,782
(106,560)
1955
(101)
11,482
56,440
108,552
1956
109,912
13,962
63,972
292,692
1957
2,540
41,151
(17,592)
1958
41,886
(17,193)
1959
44,113
(11,290)
1960
(3,456)
42,601
(15,953)
1961
47,288
(18,832)
1962
44,634
(77,796)
1963
62,496
(34,975)
1964
(32)
52,039
(7,929)
1965
59,491
83,771
*109 Opinion RAUM, Judge: 1. Transfer of Funds from Tidewater to Ravano in 1958. The principal issue is whether the Tidewater Commercial Company distributed a dividend in 1958 to its sole stockholder, Albert Ravano, which in turn depends upon an analysis of a transaction that occurred on April 28, 1958, when Tidewater transferred $903,873.48 worth of "blocked" English pounds from its account with its London agent, Wm. H. Muller & Co. Ltd., to an account which Ravano maintained with the same firm. If, as respondent contends, at least $284,039.01 of this amount (equal to Tidewater's accumulated earnings and profits) was a distribution with respect to Tidewater's stock, then, to the extent of earnings and profits, the transaction must be treated as the distribution of a taxable dividend. If this characterization of the transaction is adopted, then respondent correctly determined deficiencies in the income *110 tax of Tidewater, for failure to withhold 30 percent of the dividends for the benefit of the United States as required by section 1441 [2] of the Internal Revenue Code of 1954, and in the income tax of Ravano, who paid no United States income tax on amounts received from Tidewater in 1958, and both Tidewater and Ravano may be subject to additions to tax equal to 25 percent of the above deficiencies for failure to file returns. [3] If, on the other hand, the transaction which took place on April 28, 1958 was no more than the repayment of a bona fide indebtedness owed by Tidewater to Ravano in the amount of $604,891.29, and the creation of a receivable due Tidewater from Ravano of $298,982.19, as petitioners insist, then no taxable event took place and the respondent's determinations with respect to this issue were erroneous. *111 Resolution of this issue, then, requires us to determine first, whether the advances made to Tidewater by Ravano (directly and through his controlled corporation, SAIA) did in fact represent bona fide indebtedness rather than contributions to Tidewater's capital, and second, whether the sum transferred to Ravano over and above the amount of those advances was a loan to him, or a permanent withdrawal from the corporation. In both instances, the inquiry must focus upon the intent of the parties at the time the advances and the withdrawal were made, the crucial question in each case being whether repayment was in fact contemplated. See Leach Corporation, 30 T.C. 563, 579; Hoguet Real Estate Corporation, 30 T.C. 580, 598; 2554-58 Creston Corp., 40 T.C. 932, 936-937; Wiese v. Commissioner, 93 F. 2d 921, 923 (C.A. 8), certiorari denied 304 U.S. 562; Carl L. White, 17 T.C. 1562, 1568. Although the search for this intent often takes on an Alice in Wonderland quality when a stockholder is dealing with his closely-held corporation, see P. M. Finance Corp. v. Commissioner, 302 F. 2d 786, 789 (C.A. 3), affirming *112 a Memorandum Opinion of this Court, it is nevertheless well established that even a sole stockholder may make loans to and receive loans from his wholly-owned corporation that will be recognized as such for tax purpose, if he can prove that he had the requisite state of mind when the transaction took place. The Court cannot, of course, probe the subconscious of the stockholder (here, in fact, the sole stockholder did not even appear at the trial because of ill health), so that our decision must of necessity be based on objective factors which illuminate his intent. No one factor is determinative, but the "emphasis or weight that is to be accorded to the various factors usually examined in this connection depends upon the facts as a whole * * *." Leach Corp., supra at p. 576; See also Al Goodman, Inc., 23 T.C. 288, 300, 301; Estate of Helene Simmons, 26 T.C. 409, 423. We think the record in this case supports petitioners' contention that both the advances through the years to Tidewater and the 1958 transfer of funds to Ravano were intended to be and *113 were in fact repaid, and therefore should be recognized as genuine indebtedness. The general impression one obtains from the record is that Ravano, though respecting the multiple corporate forms into which he cast his shipping enterprise, did not hesitate, when the occasion arose, to transfer funds back and forth between himself and his corporations or between one corporation and another on a more or less informal and temporary basis, until the funds were needed elsewhere. To the extent that the funds remained invested in Ravano shipping interests, one might consider it to be permanent capital of the overall Ravano organization, but such funds certainly could not be considered the permanent capital of Tidewater. Thus, money advanced to Tidewater to purchase additional vessels from 1947 to 1949 was repaid, not through the profits of the business for the most part, but from the sale of Tidewater's ships, presumably because Ravano decided the money, or the ships (three of which were actually sold to another of Ravano's corporations) could more profitably be used in another of his corporations. Similarly, when in 1958 Tidewater had a large cash balance for which it had no use at that time, *114 Ravano withdrew it and put it to use elsewhere. This is not to say, however, that after withdrawing his entire net advances ($604,891.29) and an additional $298,982.19, Ravano did not intend to restore the latter amount to Tidewater so that it could go back into the shipping business in the foreseeable future. Although the evidence in this latter respect is not fully satisfactory - in view of the considerable lapse of time prior to the purchase of another vessel for Tidewater -, we have concluded on the entire record that there was a bona fide intention to repay the $298,982.19 to Tidewater. While we are not persuaded that Captain Saglietto was actively and continuously looking for a ship from 1958 unitl one was finally purchased in 1962, we are convinced that Ravano did intend that the $298,982.19 advance to him be eventually returned to Tidewater to purchase a ship, and merely waited until he felt that the operation of a vessel by Tidewater would be in the best interests of his entire enterprise. Of the various factors that might be considered in the determination of the loan v. equity and loan v. dividend issues, by far the most significant, in the context of this case, is that *115 both the advances to Tidewater and the loan to Ravano were in fact repaid. Although it is difficult to determine what part of the year-end balances shown as a liability of Tidewater in the SAIA/Albert Ravano account reflected actual advances, and what part was attributable to freight income received by Tidewater as agent for SAIA which would shortly thereafter be transferred to SAIA or used to pay expenses of SAIA ships in America, it is clear that most of the advances made to Tidewater in the early years of its existence for the acquisition and repair of vessels were repaid within three years. The advances from 1951 on were, in general, for working capital, and testimony at trial as well as entries to the account indicate that the balance fluctuated frequently, reflecting repayments followed by more advances. By 1958, when Tidewater transferred its pounds sterling to Ravano, it had repaid all the working capital advances as well. In view of the fact of repayment within a reasonable time, the absence of notes evidencing the corporation's indebtedness or maturity date for the repayment of the loans, loses much of its significance. It has long been recognized that dealings between *116 a stockholder and his wholly-owned corporation are often marked by informality, Cf. Irving T. Bush, 45 B.T.A. 609, 623, remanded on other grounds 133 F. 2d 1005 (C.A. 2); this was especially true here, where Ravano often shifted funds from one corporation to another whenever they were needed. Tidewater, moreover, did record these advances on its books and on its balance sheet as a liability, which told creditors that the funds were not to be looked to for the satisfaction of their claims, and from 1951 through 1956 the corporation accrued interest on the unpaid balance at the rate of 2 1/2 percent per annum. Finally, while no formal security was given for these advances, Ravano was well aware that the balance in Tidewater's account with Muller was substantial, and in fact exceeded the balance owing in the SAIA/Albert Ravano account from 1954 on. Although this balance was in "blocked" sterling, and thus was of limited usefulness to Tidewater, Ravano, whose approximately 30 ships presumably conducted extensive operations in the sterling area, could treat the balance in the Muller account just as through it were a cash reserve to pay off his advances, which *117 in fact turned out to be true. Therefore, we conclude that, to the extent of $604,891.29, the transfer of funds from Tidewater to Ravano represented the repayment of a genuine indebtedness, and was not a distribution with respect to the stock of Tidewater. Similarly, with regard to the remaining $298,982.19 transferred to Ravano to be held "on deposit" pending the advantageous purchase of a vessel for Tidewater, we consider the repayment of the entire loan within four years to be significant. Other factors indicating an intent that the money should be repaid and not considered a dividend are the fact that the loan was specifically authorized as such by the board of directors, the fact that Ravano was a wealthy man who controlled corporations owning approximately 30 ocean-going vessels and appeared to be well able to repay the loan, the fact that interest receivable was accrued by Tidewater on its books and reported as income on its tax returns and the fact that Captain Saglietto had previously demonstrated his ability to charter Tidewater vessels at a large profit, so that repayment of the loan to Tidewater to enable it again to operate as a shipowner would be to Ravano's advantage. *118 Again, the lack of notes or other formal indicia of the debt can be attributed to the informal relationship between Ravano and his whollyowned corporations, and is not controlling under the facts of this case. Respondent has urged, on brief, that Ravano's repayment in 1962 came after and was motivated solely by the audit of Tidewater's books by an Internal Revenue Service agent in the summer of 1961, when the character of the 1958 withdrawal first came into question. While the timing of the purchase of the vessel and repayment of the advance is a highly disturbing circumstance, cf. Atlanta Biltmore Hotel Corp. v. Commissioner, 349 F. 2d 677, 680 (C.A. 5), it is not determinative here where we have found on the entire record, albeit without strong conviction, that Ravano intended at all times to repay the advance from Tidewater. Cf. Moses W. Faitoute, 38 B.T.A. 32, 36; Irving T. Bush, supra, 45 B.T.A. at 623. We conclude, after consideration of all the facts and circumstances in this case, that none of the $903,873.48 transferred by Tidewater to Ravano in 1958 was in respect to the stock of the corporation, but in fact represented the repayment *119 of bona fide indebtedness and creation of a genuine loan. 2. Disallowance of Tidewater's Expenses, 1958-1961. After the sale of Tidewater's last ship in 1956 and before the purchase of another in early 1962, its income consisted largely of fees earned by it as a collecting and disbursing agent for Ravano ships while they were in American ports, interest, and recognized gains on foreign exchange. Its returns for 1958-1961 disclose total gross income from such sources in the aggregate respective amounts of $30,706.70, $33,190.43, $26,200.96, and $27,874.56. During this period, and pending the acquisition of another vessel, Tidewater's staff, consisting of Captain Saglietto and several office employees, remained intact. It paid their wages and also continued to incur other expenses, such as rent, local taxes, depreciation, etc. The deductions for all such expenses claimed on the foregoing returns were in the aggregate amounts of $40,728.32, $43,070.29, $41,603.56, and $46,334.38, for the years 1958-1961, respectively. Thus, expenses of the Tidewater organization which might have produced substantial amounts of net income if it had had one or more ships during this period, were actually *120 in excess of its gross income. And although the Commissioner states on brief that he "is not disputing that these expenses were incurred" and that the services which produced the income actually earned "admittedly could not be rendered with fewer employees or less facilities", he nevertheless seeks to justify his disallowance of expenses in the amount of $22,053.68 for 1958, $21,065.65 for 1959, $21,758.56 for 1960, and $27,974.38 for 1961. [4] In disallowing the deductions in the foregoing amounts, the Commissioner did not disclose how these amounts were computed and gave no explanation other than to state that they "do not constitute ordinary and necessary expenses of your company * * *". We hold that he erred. The theory behind respondent's action, as explained in his brief to this Court, is that the expenses incurred by Tidewater during the period 1958-1961 were not the expenses of any business of *121 Tidewater, but rather were the expenses of the various shipowning corporations, all controlled, like Tidewater, by Albert Ravano, for whom Tidewater rendered services. Respondent's contentions are that Tidewater incurred these expenses as agent for Ravano's foreign corporations and solely for their benefit, that, as an agent, Tidewater was entitled to reimbursement for all expenses incurred on behalf of its various principals, and finally, that, even though Tidewater saw fit not to press its claim for reimbursement, the expenses could not properly be deducted by Tidewater. We think that the argument is unsound. The expenses were admittedly of the type that are deductible, and we find no merit either in the suggestion that they were in fact the expenses of other Ravano corporations or in the argument that Tidewater was entitled to reimbursement from those corporations in the full amount of its costs. Tidewater was actually engaged in business, the fees that it charged were within the range of fees for comparable services rendered by others, and there is certainly no basis for disregarding its corporate entity in whole or in part. Cf. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 440. *122 The Commissioner's emphasis on the fact that Tidewater never operated at a profit when, from 1957 through 1961, it was solely a collecting and disbursing agent, overlooks the fact that it intended to acquire a ship and that it was appropriate to maintain its organization intact during a reasonable period pending such event. Cf. Harold Haft, 40 T.C. 2. Although this is not a section 482 case, it is pertinent to note that the fees charged by Tidewater were based upon a published schedule of rates for the port of Baltimore. And we cannot find that there was any agreement, express or implied, whereby Tidewater could have obtained reimbursement from any of the other Ravano corporations for losses which it sustained. Cases like All Russian Textile Syndicate, Inc. v. Commissioner, 62 F. 2d 614 (C.A. 2) affirming 23 B.T.A. 1392, and Standard Oil of New Jersey, 7 T.C. 1310, relied upon by the Government, involved entirely different factual situations and are distinguishable here. Decision in Docket No. 2884-65 will be entered for the petitioner. Decision in Docket No. 2885-65 will be entered under Rule 50. Footnotes
1. The schedule does not reflect gains and losses from fluctuations in the value of foreign exchange held by Tidewater. a1 Includes charitable deductions in excess of amount allowable under the Internal Revenue Code and therefore not deducted on Tidewater's income tax returns.↩
2. SEC. 1441. WITHHOLDING OF TAX ON NONRESIDENT ALIENS. (a) General Rule. - * * * all persons, in whatever capacity acting * * * having the control, receipt, custody, disposal or payment of any of the items of income specified in subsection (b) (to the extent that any of such items constitutes gross income from sources within the United States), of any nonresident alien individual * * *, shall * * * deduct and withhold from such items a tax equal to 30 percent thereof * * * (b) Income Items. - The items of income referred to in subsection (a) are interest * * * dividends * * * SEC. 1461. RETURN AND PAYMENT OF WITHHELD TAX. Every person required to deduct and withhold any tax under this chapter shall on or before March 15 of each year, make return thereof and pay the tax to the officer designated in section 6151. Every such person is hereby made liable for such tax and is hereby indemnified against the claims and demands of any person for the amount of any payments made in accordance with the provisions of this chapter. ↩
3. SEC. 6651. FAILURE TO FILE TAX RETURN. (a) Addition to the Tax. - In case of failure to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.↩
4. The disallowance of these amounts was in part directly responsible for the determination of deficiencies for the years 1958-1961, and indirectly responsible for the determination of deficiencies for 1955 and 1956 by reason of disallowance of carryback losses to those years.↩