**ALTERMAN FOODS, INC., Plaintiff-Appellant,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

**No. 73–3852.**

United States Court of Appeals, Fifth Circuit.

Dec. 30, 1974.

Rehearing and Rehearing En Banc Denied Jan. 13, 1975.

Cleburne E. Gregory, John C. Gray, Atlanta, Ga., for plaintiff-appellant.

Scott P. Crampton, Asst. Atty. Gen., Myron C. Baum, Atty., Meyer Rothwacks, Chief, App. Section, Tax Div., Dept. of Justice, Washington, D. C., John W. Stokes, U. S. Atty., Julian Longley, William D. Mallard, Jr., Asst. U. S. Attys., Atlanta, Ga., Gary R. Allen, Jay R. Weill, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before TUTTLE, THORNBERRY and SIMPSON, Circuit Judges.

TUTTLE, Circuit Judge:

This tax case involves a dispute over the legal effects of cash advances made to a parent corporation by a number of its wholly-owned subsidiaries, shown on the books of both the subsidiaries and parent as debts outstanding, but on which there were no interest charges, no set maturity date, no notes of indebtedness, nor any apparent legal compulsion to repay the amounts outstanding. No effort was ever made to force repayment on the part of any of the subsidiaries involved.

The Internal Revenue Service assessed a deficiency of $113,882.72 with interest of $18,193.78 on the theory that these advances were in fact dividends and thus were taxable income for the 1965 tax year. The present suit was filed seeking a refund and it was tried to a jury, which found for the plaintiff and against the government. The trial court entered judgment n. o. v. for the government, finding that the advances were in fact dividends and taxable as such. The taxpayer appeals, challenging the finding that these advances were not genuine debts, but disguised dividends. We affirm.

## I.

Alterman Foods, Inc. (Alterman) is in the wholesale grocery business—operating some 52 subsidiary corporations which in turn own and operate retail grocery outlets known as Big Apple Supermarkets. Some of the Big Apple corporations run more than one retail outlet, so that some 57 retail grocery outlets are involved in the case. Each Big Apple store had a separate manager, but the parent Alterman maintained books for all the corporations, and supervised day-to-day management.

The taxpayer Alterman and each Big Apple corporation at the time of each subsidiary's incorporation entered into an agreement whereby Alterman agreed to purchase and warehouse most of the store's inventory, furnish supervision, prepare payrolls and maintain all accounts and records, provide trucking services, maintain insurance coverage, conduct central advertising, and pay for all fixtures and other remodeling ex-

penses or repairs which would be needed to maintain the store. In exchange for these services the subsidiary agreed to pay a management fee, in 1965 equalling approximately 3% of gross sales, and in addition agreed to make advances to the parent upon demand. The terms of each of the contracts were uniformly as follows:

"You (the subsidiary) will advance to us (the parent) from time to time, upon our request, such funds as we may require, which will be credited to your account. Accountings shall be made and had between us from time to time, at such time as we may mutually agree upon."

Three of the Alterman brothers active in the business served as executive officers for each of the 52 subsidiaries. Their method of operation was to transfer *all* proceeds save those funds needed for immediate operating expenses (such as payrolls) to the parent (the taxpayer), on a weekly or biweekly basis. Funds from each of the subsidiaries were then transferred to a central account, which the parent, Alterman, used for all its operating expenses. These expenses included not only those incurred on behalf of each of the subsidiaries which had debts outstanding, but for all other expenses incurred by Alterman in any of its business activities. Among the facets of Alterman's business largely unrelated to the Big Apple retail stores

were a trucking concern, a real estate holding company, and a wholesale grocery business selling to other independent supermarkets, restaurants and public institutions.

At the end of the tax year in question, Alterman owed its subsidiaries the total of $3,723,006.00 and was owed in turn by its Big Apple subsidiaries a total of $1,614,223.00.[1] The constructive dividends were assessed by the Internal Revenue Service for the advances from 27 of the 52 subsidiary corporations which showed a credit balance on May 1, 1965 in their current accounts with Alterman. The government assessed as a dividend the increase in each credit balance from the total of the year before.[2] The legal issue before us is whether or not these advances were in fact genuine loans, in which case they would not be taxable to Alterman as a dividend,[3] and thus not includable in gross income.[4]

## II.

Naturally in considering the propriety of the trial court's entry of judgment n. o. v. we consider all the evidence, not just that evidence which supports the plaintiff's case, but do so in a light most favorable to the party opposing the motion. Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (*en banc*). The cases are clear that the central issue here is the factual one of whether there was a definite intent to repay the ad-

1. Alterman's books showed total accounts payable by its subsidiaries of $3,798,967.00. The magnitude of this figure was largely due to the inclusion in the accounts of the amounts owed by the real estate subsidiary, Altmo, which in 1965 totalled some $2,184,744.00.

2. For those subsidiaries which had owed Alterman some amount from the year before, the government only assessed as a dividend those amounts which exceeded payment of the amounts owed from previous years.

3. Corporate distributions of earnings and profits are taxable as dividends to the shareholder under 26 U.S.C. §§ 61(a), 301 and 316 (the Internal Revenue Code of 1954). Section 316 of the Code defines dividends as "any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or
(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year . . .), without regard to the amount of the earnings and profits at the time the distribution was made.
Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits."

4. § 243(a) of the Code provides for an 85% intercorporate dividend deduction, and the deficiency assessed by the Commissioner was based on only 15% of the total amount advanced by the 27 subsidiary corporations on the taxpayer, which was included as a disguised dividend.

vances. Chism's Estate v. Commissioner, 322 F.2d 956, 960 (9th Cir. 1963); Commissioner v. Makransky, 321 F.2d 598 (3d Cir. 1963); Oyster Shell Products Corp. v. Commissioner, 313 F.2d 449 (2d Cir. 1963); Spheeris v. Commissioner, 284 F.2d 928 (7th Cir. 1960), cert. denied, 366 U.S. 944, 81 S.Ct. 1673, 6 L.Ed.2d 855 (1961); Clark v. Commissioner, 266 F.2d 698, 710–711 (9th Cir. 1959); Roschuni v. Commissioner, 29 T.C. 1193 (1958); affirmed per curiam, 271 F.2d 267 (5th Cir. 1959), cert. denied, 362 U.S. 988, 80 S.Ct. 1074, 4 L. Ed.2d 1021 (1960).

This problem of recognizing genuine debt from spurious ones is one which arises in many contexts—the most familiar being the vast line of so-called debt-equity cases, where the issue is whether an advance made by a shareholder to a corporation is a loan, or a contribution to capital.[5] This case involves a variation on the debt-equity problem, for here it is the corporation making advances to its sole shareholder, in this case its parent corporation.

■ The appellant taxpayer argues that to the extent the question of intent

is a factual issue, that question is for the jury if the taxpayer asserts an intention to repay and thus arguably poses a credibility choice for the trier of fact to resolve. This argument has been rejected in a line of debt-equity cases decided by this Court, Tyler v. Tomlinson, 414 F.2d 844 (5th Cir. 1969); Berkowitz v. United States, 411 F.2d 818 (5th Cir. 1969). In these cases this Court recognized that it "requires more than a mere declaration of intention to create an indebtedness and more than the existence of corporate paper encrusted with the appropriate nomenclatural captions," Tyler v. Tomlinson, *supra*, 414 F.2d at 850, and concluded that "it is not the jury's function to determine whether the undisputed operative facts add up to debt or equity. This is a question of law." Berkowitz v. United States, *supra*, 411 F.2d at 821. We believe this analogous line of cases is controlling.

■ Like the debt-equity cases, many different factors are considered in determining whether an advance by a corporation to a shareholder is a loan or a dividend.[6] While the factors consid-

---

5. *See, e. g.,* Estate of Mixon v. United States, 464 F.2d 394 (5th Cir. 1972); Tyler v. Tomlinson, 414 F.2d 844 (5th Cir. 1969); Berkowitz v. United States, 411 F.2d 818 (5th Cir. 1969); Curry v. United States, 396 F.2d 630 (5th Cir. 1968), cert. denied, 393 U.S. 967, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968); Harlan v. United States, 409 F.2d 904 (5th Cir. 1969); Tomlinson v. The 1661 Corp., 377 F.2d 291 (5th Cir. 1967); United States v. Snyder Brothers Co., 367 F.2d 980 (5th Cir. 1966), cert. denied, 386 U.S. 956, 87 S.Ct. 1021, 18 L.Ed.2d 104 (1967); Aronov Construction Co. v. United States, 223 F.Supp. 175 (M.D.Ala.1963), affirmed, 338 F.2d 337 (5th Cir. 1964); Montclair, Inc. v. Commissioner, 318 F.2d 38 (5th Cir. 1963); Campbell v. Carter Foundation Production Co., 322 F.2d 827 (5th Cir. 1953); Rowan v. United States, 219 F.2d 51 (5th Cir. 1955). *See, generally,* Plumb, The Federal Income Tax Significance of Corporate Debt, 26 Tax L.Rev. 369 (1971); B. Bittker & R. Eustice, Federal Income Taxation of Corporations & Shareholders, ¶¶ 4.02, 4.03 (3d ed. 1971).

6. At least 13 different factors have been emphasized by this Court in the past, including:

the names given to the certificates of indebtedness by the parties; the presence of a fixed maturity date; the source of the payments; the right to enforce payment; the resultant increase in participation in management; the status of the contribution in relation to regular corporate creditors; the intent of the parties; the adequacy of capitalization; the identity of interest between the creditor and stockholder; the source of the interest payments; the ability of the corporation to obtain other funding from third parties; the extent to which the advance was used to acquire corporate capital assets; and the failure of the debtor to repay on the due date or to seek postponement. These factors are by no means all inclusive. 38 relevant factors have been used at various times by the courts in determining this issue. *See,* Holzman, The Interest—Dividend Guidelines, 47 Taxes 4 (1969).

The approach of this Court has been to consider all the various factors, and to weigh the evidence favoring characterization of the advances as equity as opposed to debt, while realizing that the various factors are not of equal significance and that no one factor is controlling. *See,* John Kelly Co. v.

ered in debt-equity cases are to some extent dissimilar to those considered in corporate advance cases, due to the natural dissimilarity of the factual settings in which the cases occur,[7] the problem of resolving conflicts between the taxpayer's avowed intention to repay and his pattern of conduct indicating no intention to repay is identical in both types of cases. We believe the proper rule is that mere declarations by the parties that they intend a certain transaction to constitute a loan is insufficient if it fails to meet more reliable indicia of debt which indicate the "intrinsic economic nature of the transaction." Fin Hay Realty Co. v. United States, 398 F. 2d 694, 697 (3d Cir. 1968).

The reason this rule has developed is largely because these cases typically arise in the context of a closely-held corporation, where the parties do not deal at arm's length. In this case the Alterman brothers act as the principal executive officers of both the parent corporation and its wholly-owned subsidiaries —and it is highly unrealistic to expect them to enforce obligations against themselves.

▉ Thus, whatever the terms of the agreement between the parent and its subsidiaries, the parent's complete control of the creditor subsidiaries "will enable [it] to render nugatory the absolute language of any indebtedness." P. M.

Finance Corp. v. Commissioner, 302 F.2d 786, 789 (3d Cir. 1962). Where, as here, corporate advances are made to the corporation's sole stockholder, courts look with great care to the surrounding facts and view with some suspicion declarations of intent which have the effect of maximizing the tax benefit of that stockholder. Livernois Trust v. Commissioner, 433 F.2d 879, 881 (6th Cir. 1970); P. M. Finance Corp. v. Commissioner, supra; Albert Ravano, 26 T.C.M. 793, 799 (1967); Brake & Electric Sales Corp. v. United States, 185 F.Supp. 1, 3 (D.Mass.1960), affirmed, 287 F.2d 426 (1st Cir. 1961). "We therefore look not to mere labels or to the self-serving declarations of the parties, but to the more reliable criteria of the circumstances surrounding the transaction. If none of these circumstances are in dispute, there is no jury question." Tyler v. Tomlinson, supra, 414 F.2d at 850.

### III.

Like United States v. Snyder Brothers Co., 367 F.2d 980 (5th Cir. 1966) cert. denied, 386 U.S. 956, 87 S.Ct. 18, 1021 L.Ed.2d 104 (1967) we believe in this case the intent of the parties was "objectively manifested," Kraft Food Co. v. Commissioner, 232 F.2d 118, 123 (2d Cir. 1956) by the terms of the agreement between the parent and its wholly-owned subsidiaries. The practice of the

---

Commissioner, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278 (1946); Dillin v. United States, 433 F.2d 1097 (5th Cir. 1970); Tyler v. Tomlinson, supra.

7. Both the issues of the effect of the stockholder's participation in the management of the corporation, and the extent to which the corporation is thinly capitalized, which are important in debt-equity cases, are irrelevant to a characterization of an advance by the corporation to a shareholder. Among the factors considered by the courts in evaluating whether an advance to a shareholder is a dividend or a loan are: the extent to which the shareholder controls the corporation; the earnings and dividend history of the corporation; the magnitude of the advances; whether a ceiling existed to limit the amount the corporation advanced; whether or not security was given for the loan; whether

there was a set maturity date; whether the corporation ever undertook to force repayment; whether the shareholder was in a position to repay the advances; and whether there was any indication the shareholder attempted to repay the advances. Livernois Trust v. Commissioner, 433 F.2d 879 (6th Cir. 1970); Jacob M. Kaplan, 43 T.C. 580 (1965); Chism's Estate v. Commissioner, 322 F.2d 956 (9th Cir. 1963); Oyster Shell Products Corp. v. Commissioner, 313 F.2d 449 (2d Cir. 1963); Roschuni v. Commissioner, 29 T.C. 1193 (1958), affirmed per curiam 271 F.2d 267 (5th Cir. 1959), cert. denied, 362 U.S. 988, 80 S.Ct. 1074, 4 L.Ed. 2d 1021 (1960); William C. Baird, 25 T.C. 387 (1955); A. J. Cohen, ¶ 63–234 P–H Memo T.C. (1953). See, generally, Note, Stockholder Withdrawals—Loans or Dividends?, 10 Tax L.Rev. 469 (1955); Bittker & Eustice, supra, Note 5 at ¶ 7.05.

parties of transferring virtually all the gross proceeds of the subsidiaries to the parent is undisputed, as is the fact that the parent "repaid" advances only in the sense that it made expenditures on behalf of all of its subsidiaries, and for those subsidiaries which consistently failed to make a profit eventually the parent's relationship turned from that of debtor to that of creditor. For a number of subsidiaries, the accounts fluctuated frequently. No more systematic effort was made to repay the advances, nor was the parent under any real compulsion to do so. It would be incredible to expect the three Alterman brothers who acted as officers of each of the Big Apple subsidiaries (as well as principal officers of Alterman Foods, Inc.) to enforce an outstanding obligation which in effect they owed themselves.

As we did in *Snyder Brothers, supra,* 367 F.2d at 983, we again distinguish Rowan v. United States, 219 F.2d 51 (5th Cir. 1955). Unlike the ambiguity surrounding the intent of the parties in *Rowan* which made the parties' assertions of intent meaningful, no similar ambiguity exists here. Whether Alterman eventually repaid the advances made by its subsidiary was acknowledged to be almost wholly a function of the future success of the subsidiaries' business operations. The taxpayer at no time asserted the loans would be repaid within any given period, nor was there any evidence of a plan of repayment. For those subsidiaries which continued to remain profitable, the advances would never be repaid.[8] "[N]o deliberate attempt on [the shareholder's] part to take affirmative steps toward repayment or indicating an intention of repayment," Roschuni v. Commissioner, *supra,* 29 T.C. at 1203 was proven by Alterman. And like the facts in *Roschuni,* "[t]he

fact that the books of the corporation reflected these withdrawals in the form of open accounts is not a controlling factor in determining the intentions of the party." *Id.*

Thus, despite certain similarities in the bookkeeping procedures followed by the individual taxpayers in *Rowan* and *Alterman Foods,* the enormous differences in the factual settings of the two cases, in our view, make *Rowan* inapposite. Some real business purpose was served by the advances to the corporation by the taxpayers in *Rowan*—but no similar purpose can be discerned here. No explanation was offered for Alterman's need to "borrow" all the proceeds generated by its retail subsidiaries— save for the desirability of avoiding all federal taxes on the transfer. Alterman Foods chose to do business by separately incorporating individual retail stores, and we do not believe it can now ignore the tax consequences of that decision simply by consistently showing the advances as loans on its own books.

■ We believe the following objective criteria support the determination of the trial court that the advances were not genuine debt, but rather should be taxed as dividends. Alterman's account was an open one, with no apparent ceiling. Alterman's debit balance was steadily increasing, and the data subsequent to the 1965 tax year demonstrate that the amount of advances from the consistently profitable subsidiaries continued to increase.

There was no repayment schedule, indeed there was no fixed date of maturity, nor any indication that at some future point the sums advanced would necessarily be repaid. No interest was charged by the subsidiaries, nor was any collateral provided. The subsidiaries made no systematic effort to obtain re-

---

8. Because the primary method of "repayment" was to use current expenditures for inventory and overhead made on behalf of each subsidiary to offset the subsidiary's advances, so long as the subsidiary's proceeds continued to outpace its costs (i. e., so long as it returned a profit), the advances would never be repaid. Despite claims by the tax-

payer that occasional major expenditures for remodeling or relocation would offset advances by all profitable subsidiaries, this was proven to be untrue by the fact several of the 27 subsidiaries whose advances were assessed as a dividend underwent this type of major redesign in the years following 1965, yet their advances remained largely unpaid.

payment, nor did Alterman make any effort to repay the advances.

Under the terms of the agreement it does not appear that there was any absolute duty to repay. Rather it appears that the debt was payable only at the discretion of the debtor. The contract requiring the subsidiaries to make advances to Alterman did not establish an unconditional obligation to pay. By the terms of its agreement with its subsidiaries, Alterman was obliged to account for the advances it had received "at such time as we may mutually agree upon." This promise of Alterman to account for its debts if the parties should so agree is virtually illusory—and even were it construed to mean the subsidiary might be able to obtain an equitable accounting, this would require the Alterman brothers to seek collection against themselves.

Financial records admitted into evidence at the trial demonstrated that the profitable subsidiaries had large earned surpluses, but despite this had relatively poor dividend records prior to the tax year in question.

There was no particular need on the part of the parent for these advances, and certainly the advances were not intended to meet a particular business exigency or emergency—rather they were used for general operating expenses of Alterman, and not solely for the benefit of the subsidiaries. At trial the government proved that at times the parent used the advances to begin new subsidiaries, which had the incidental effect of increasing competition against other subsidiaries in the same general locale.

Finally no notes or certificates of indebtedness were used, nor did it appear that the parent would be able to repay the advances save by borrowing the money from outside lenders.

These objective criteria tend to disprove the assertion of the taxpayer that the advances made were genuine debts. We believe that the taxpayer failed to establish there was an unconditional obligation to make repayments within some determinable time period, and failed to establish that there was a defi-nite intention to honor such obligation by making full repayment. What factors the taxpayer does argue establish its intention to repay are in our opinion insubstantial. Such allegedly objective economic indicia of debt such as consistent bookkeeping and consistent financial reporting on balance sheets are in our opinion little more than additional declarations of intent, without any accompanying objective economic indicia of debt. Some of the factors argued by the taxpayer have been considered in other cases as indicating an intention to create a genuine debt, such as consistent financial reporting, SEC filings, and the like, but standing alone they do not have the force of the objective criteria which we previously discussed, and do not present a jury question over the intent of Alterman.

In our view the evidence overwhelmingly established the intention of Alterman to receive the proceeds from its subsidiaries with no genuine intention to repay. The objective criteria conclusively establish that the advances failed to meet the test for debts established by the previous cases, and accordingly we affirm the judgment of the trial court.