SMITHCO ENGINEERING, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentSmithco Engineering, Inc. v. CommissionerDocket No. 16719-81United States Tax CourtT.C. Memo 1984-43; 1984 Tax Ct. Memo LEXIS 630; 47 T.C.M. (CCH) 966; T.C.M. (RIA) 84043; January 25, 1984. Steven E. Edgar, for the petitioner. Patrick E. McGinnis, for the respondent. SWIFTMEMORANDUM OPINION SWIFT, Judge: Respondent determined a deficiency of $121,656.48 in Federal income tax for the petitioner's taxable year ending January 31, 1976. *631 The sole issue for decision is whether petitioner is entitled to a bad debt deduction under section 1661 for transfers of cash, merchandise and other unidentifiable items to its wholly owned subsidiary Smithco Europe, Inc., or whether such transfers should be characterized as equity. This case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and attached exhibits are incorporated herein by reference. The pertinent facts are summarized below. Smithco Engineering, Inc. (referred to herein as "Engineering") was a corporation organized under the laws of the State of Oklahoma, with its principal place of business in the Tulsa metropolitan area. Engineering was engaged in the business of manufacturing and selling heat exchangers. Smithco Europe, Inc. (referred to herein as "europe") was a corporation organized under the laws of the State of Oklahoma, with its principal place of business in Paris, France. Europe was engaged in the business of selling heat*632 exchangers which had been manufactured by Engineering. At all relevant times, there were 370 issued and outstanding shares of common stock of Engineering. The stock ownership is reflected below: Number ofNameSharesOrville L. Smith201Sybil Smith104James Lee37Roy Smith25Robert Beecher3Orville L. Smith and Sybil Smith are husband and wife. Roy Smith is the nephew of Orville Smith. At all times prior to January 31, 1976, Engineering owned all of the issued and outstanding shares of Europe, i.e., Europe was a wholly owned subsidiary of Engineering.The books and records of Negineering contained account 124, entitled Accounts Receivable-Europe. The balance of this account represented transfers of cash from Engineering to Europe, payment of Europe's operating expenses by Engineering, payment of a note of Europe's by Engineering, shipments of merchandise by Engineering to Europe, and amounts which cannot now be identified as to the form of payment, as follows: TypeCash Transfers$ 84,600.00Direct Payment of Expenses6,214.00Direct Payment of Note1,680.00Shipments of Merchandise68,070.44Unidentifiable160,786.43Total$321,350.87*633 The cash transfers were made on the dates and in the amounts indicated below: DateAmount6-07-66$10,000 9-02-665,000 9-30-6615,000 1-30-672 [40,000]9-30-675,000 10-30-6716,000 11-30-6714,000 1-30-6745,000 7-31-672,500 10-30-68100 9-30-6912,000 Total$84,600 Shipments of merchandise were made on the dates indicated below: DateAmount1-30-67$27,465.744-30-68124.006-30-687,596.806-30-68240.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.159-30-68112.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.1510-31-682,931.4010-31-68112.003-31-692,292.803-31-691,440.166-30-69200.006-30-703,985.296-30-704,412.818-31-703,820.0410-31-701,919.001-31-702,214.282-28-714,434.842-28-713,130.485-31-711,322.006-30-71214.50Total$68,070.44Of the transfers totalling $160,786.43 in account 124 which cannot be identified as to the form of payment, the following separate amounts were transferred on the dates indicated: DateAmount2-01-66$ 86,895.621-30-66500.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,081.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,352.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,957.811-31-713 12,000.00$160,786.43*634 At no time did Europe execute any promissory notes, security agreements or other evidence of indebtedness with respect to any of the alleged advances. No interest was charged, nor was any paid. Europe did not make any repayments of the alleged advances. Engineering did not file suit at any time to enforce repayment of the alleged advances, nor does the record indicate that a formal demand for repayment was ever made. At all times relevant herein, the total invested capital in Europe was $10,000. The debt/equity ratio of this company in 1970, 1972 and 1973 can be derived from the financial statements as follows: Debt EquityDateRatio1-31-7037 to 13-31-7252 to 13-31-7341 to 1The retained earnings deficit of Europe was $9,693 on January 31, 1970 and grew to $118,088 on March 31, 1973. The unaudited balance sheets as of those two dates are set forth below: Smithco Europe, Inc. Paris, FranceBalance Sheet As*635 of January 31, 1970(Unaudited) AssetsAccounts receivable$ 49,807 Inventory142,520 Fixed Assets176,233 Deposits4,409 Total Assets$372,969 Liabilities and CapitalAccounts and notes payable$ 62,834 Due to officers and affiliates309,828 Capital stock10,000 Retained earnings (deficit)(9,693)Total Liabilities and Capital$372,969 Smithco Europe, Inc. Paris, FranceBalance Sheet March 31, 1973(Unaudited) AssetsAccounts receivable$165,725 Inventory88,183 Fixed assets47,228 Other assets4,406 Total Assets$305,542 Liabilities and CapitalAccounts and notes payable$135,575 Due to officers and parent corporation278,055 Capital stock10,000 Retained earnings (deficit)(118,008)Total Liabilities and Capital$305,542 On January 3, 1975, Orville Smith offered to buy all of the common stock of Europe from Engineering for $24,604. This sale was completed approximately one year later, on January 31, 1976. On that date, all of the issued and outstanding shares of Europe were transferred to Orville Smith. At that time, Engineering also apparently relinquished*636 any right to collect any amounts due it from Europe. The bookkeeping entries reflecting the sale of stock and the elimination of the balance in the accounts receivable of Engineering are reflected below: DebitCreditAccounts Receivable -Orville L. Smith$ 24,604Bad Debts253,451Accounts Receivable -Europe$268,055Investment -stock ofEurope10,000Orville Smith and James Lee are the only individuals having personal knowledge of the operations of Europe. It has been stipulated that in their opinions the prospects for the success of Europe were good.Section 166(a) sets forth the general rule that there shall be allowed a deduction for any debt which becomes worthless within the taxable year. The income tax regulations under section 166 provide that the deduction must relate to bona fide debts arising out of a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Also, a gift or contribution to capital is not considered a debt for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs.*637 The issue for our consideration is whether the transfers from Engineering to Europe constituted bona fide debts, or whether they were capital contributions. If they were debts, we would then have to decide whether the debts became worthless in petitioner's taxable year ending January 31, 1976. If the transfers were capital contributions, the amount of the transfers would then be added to the basis of the Europe stock held by Engineering prior to the sale of the stock to Orville Smith. Sec. 1016(a)(1). However, because the parties have stipulated that Orville Smith and petitioner are related parties within the meaning of section 267, the capital loss which would otherwise result upon the sale of the stock would not be allowable. 4*638 In considering the debt versus equity question, this Court and others have consistently relied upon the presence of a number of specific factors, which may be summarized as follows: (1) the formal indicia of debt, including, but not limited to the presence of promissory notes or other documents evidencing the indebtedness, the existence of a fixed maturity date, and the bookkeeping treatment of the transactions; (2) the availability of outside credit; (3) the repayment history; (4) the status of the alleged debt in relation to regular corporate creditors, including whether the debt was subordinated; (5) the efforts to enforce repayment; (6) the use to which the alleged loan proceeds were put; (7) whether participation in management occurred as a result of the alleged advances; (8) the risk of nonrepayment; (9) the adequacy of the capital structure, including the debt/equity ratio; and (10) the intent of the parties. See Dixie Dairies Corp. v. Commissioner,74 T.C. 476 (1980); Fin Hay Realty Co. v. United States,398 F.2d 694 (3d Cir. 1968); United States v. Uneco, Inc.,532 F.2d 1204 (8th Cir. 1976).*639 As previously explained by this Court, the ultimate question we must answer is whether there was a genuine intent to create a debt, with a reasonable expectation of repayment, and whether that intention comports with the economic reality of a debtor-creditor relationship. Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 377 (1973). In applying the factors enumerated above to the instant case, it is clear that virtually every factor points to the finding that the alleged advances in question in this case were capital contributions rather than debt. Except for the fact that the bookkeeping entries treated the transfers as debt, 5 all other formal indicia of debt are completely lacking in this case. No notes were ever signed or drawn up, there was no fixed maturity date or schedule of repayment, and no interest was charged. While petitioner may be correct that the lack of formalities is frequently present in the case of a closely held corporation, "the control element suggests the opportunity to contrive a fictional debt, an opportunity less present in an arms-length*640 transaction between strangers." Cuyuna Realty Co. v. United States,382 F.2d 298, 301 (Ct. Cl. 1967). Turning to the second factor, it appears likely that no outside credit was available to Europe at the time of the advances. Europe continued to show losses year after year.The available financial statements showed negative retained earnings which grew from $9,693 on January 31, 1970 to $118,088 on March 31, 1973. In light of the yearly losses which were being incurred, it is highly unlikely that outside credit was available. Certainly by 1974, no bank credit was available. This is reflected in a memorandum from Orville Smith to Jim Lee dated December 20, 1974, which states-- Paul and I have investigated all sources of French credit. For one thing, our earnings picture almost eliminates banking credit unless fully guaranteed by me from Tulsa. Even then banking*641 is impossible at this time due to the severe limitations by the government in fighting inflation. French credit is just not available. No repayments of the alleged advances were ever made. No interest was paid. A defacto subordination of the alleged advances occurred in that other creditors were paid while no repayments were made to petitioner. 6 There were no formal documents evidencing the subordination, but then there were none memorializing the "debt" either. No lawsuits were filed to attempt to recover any portion of the debt and the record contains no evidence that a formal demand for repayment was ever made. The parties involved simply concurred that their "money is lost." Apparently because the company was undercapitalized, the alleged advances were used to pay operating expenses. The seventh factor, participation in management as a result of the advances, is not a meaningful criterion where the same individuals are in control of both debtor and creditor corporations before, during*642 and after the alleged advances. With regard to the risk involved with these alleged advances, Europe's history of losses would have made any true advances extremely risky. Petitioner had little more than a poorly founded hope that Europe would eventually become profitable as a basis for expecting repayment. The ninth factor is the adequacy of the debtor's capital structure. As set forth previously, the unaudited financial statements submitted by petitioner reflect very high debt/equity ratios. These ratios support respondent's claim that petitioner was thinly capitalized. Petitioner argues that a large amount of capital is not necessary in the sale business where high debt/equity ratios are frequently encountered. However, the constantly recurring need of Europe for infusions of cash underscores the fact that a capital investment of $10,000 was woefully inadequate in this situation. Specific evidence as to the intent of the parties is not in the stipulation of facts, nor in the exhibits. Based on the facts previously discussed, it is clear that petitioner could not have had an intent to make bona fide loans of the funds in question. For the reasons set forth above, it*643 is held that the transfers involved were capital contributions and did not represent bona fide indebtedness. Therefore, petitioner is not entitled to a bad debt deduction under section 166. Because Orville Smith and petitioner are related parties within the meaning of section 267, petitioner is also not entitled to a capital loss on the sale of Europe stock to Orville Smith. To reflect the foregoing, Decision will be entered for the respondent.Footnotes1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, and in effect during the year at issue.↩2. This $40,000 credit to the account is not explained by the parties.↩3. This $12,000 amount apparently represents transfers on various occasions to Europe from another related company named Smithco Manufacturing Co.No further information concerning this $12,000 is contained in the record.↩4. Relevant portions of section 267 provide: (a) Deductions Disallowed.--No deduction shall be allowed-- (1) Losses.--In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b). * * * (b) Relationships.--The persons referred to in subsection (a) are: * * * (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; * * *↩5. Note that "consistent bookkeeping and consistent financial reporting on balance sheets are * * * little more than additional declarations of intent, without any * * * objective economic indicia of debt." Alterman Foods, Inc. v. United States,505 F.2d 873, 879↩ (5th Cir. 1974).6. This explains why the debt/equity ratio declined from 52 to 1 on March 31, 1972 to 41 to 1 on March 31, 1973, despite the absence of any repayment to Engineering.↩