Filed 6/20/16  Abassi v. Abassi CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MAHMOUD REZAI ABASSI, | |
| Plaintiff and Respondent, | G051596 |
| v. | (Super. Ct. No. 528149) |
| HOSSEIN ABASSI, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Franz E. Miller, Judge.  Affirmed.

Wordes, Wilshin & Conner and Frank A. Conner for Defendant and Appellant.

Jeffrey S. Benice for Plaintiff and Respondent.

## I.  INTRODUCTION

This appeal arises out of a judgment for about $245,000 in favor of Mahmoud Abassi (Mahmoud) against his nephew Hossein Abassi (Hossein), made upon a referee's report ascertaining the profits of two Laguna Beach restaurants, Greeter's Corner and C'est La Vie, for the period 2005 through 2013.  Appellant Hossein raises two main accounting issues and one primary legal issue.  The two accounting issues are (1) whether the referee (and thence the trial court) incorrectly recharacterized as profits "loans" made by the restaurants to Hossein himself and his sister, and (2) whether *un*cashed rent checks written by the restaurants to the landlord of Greeter's Corner, Taghi Fouladi (Fouladi) – who is also 50 percent partner in the two restaurants – should have been treated by the referee as a proper rent expense, instead of again being recharacterized as profits.  The legal issue is (3) whether, in the accounting, the referee should have deducted from the total profits made in the years 2005 through 2013 losses incurred by the restaurants in the recession years of 2011 and 2012.

Hossein loses on all three issues.  As we explain below, substantial evidence supports the referee's characterization of both the loans and the uncashed rent checks as profits.  And the legal issue, though complex, also leads to affirmance of the judgment.  In fine, a previous order – an order *so* res judicata it was made back in the George H.W. Bush administration – provided Mahmoud would be entitled to no less than half of Fouladi's draw.  As the evidence was developed at the hearing, it turns out that Fouladi took a draw of at least $24,000 in both loss years.  So Mahmoud might have been entitled to $12,000 for each of those loss years and an even bigger judgment than we confront here.  But there is *some* good news for Hossein in all of this:  Mahmoud has taken no cross-appeal from the judgment challenging this underpayment, so we simply leave the existing judgment intact.

## II.  FACTS

This is a case in which there are three main characters:  An uncle, Mahmoud; a nephew, Hossein; and Hossein's business partner, Fouladi.[1]  Both Hossein and Fouladi met while working for Fluor Corporation in Iran at the time of the late 1970's Iranian revolution.  Both escaped to the United States.  Once here, Fouladi decided to open a small business of his own and, despite being trained as an engineer, went into the restaurant business.[2]  He found a run-down hot dog stand in Laguna Beach, fixed it up and made it "Greeter's Corner."[3]  Fouladi thought of Hossein as a son, and soon asked him to become a partner in the new business.

Hossein agreed.  And that was where his uncle Mahmoud came in.  Mahmoud was still living in Iran, and, like many Iranians, wanted to get his money out of the country.  He sent Hossein $200,000 to be used for investment.  Hossein used some of the $200,000 for his initial capital contribution to the restaurant, but did not tell Fouladi about it.

Greeter's Corner prospered, allowing Hossein and Fouladi to purchase, in the mid-1980's, C'est La Vie a few doors to the south.  In 1986, uncle Mahmoud moved to the United States and to Fouladi's surprise, inquired how "their" restaurants were doing.  Mahmoud was shocked to learn he was not a named partner.

---

[1]     Because the plaintiff and the defendant have the same last name (Abassi), the litigation and the briefing have denominated them by their first names, Mahmoud and Hossein.  We follow suit; no disrespect is intended.  Ordinarily then, for the sake of treating all parties equally, we would call Hossein's partner Fouladi by his first name too.  However, throughout the litigation and in the present briefing, both Mahmoud and Hossein have referred to themselves by their first names but referred to Fouladi by his last name, so again we will adopt the denomination of the parties.

[2]     Our statement of the facts of the origins of the restaurants is largely a paraphrase of an arbitration award written by Judge H. Warren Knight back in 1989.

[3]     There are Orange Countians old enough to remember Eiler Larson, a shaggy-haired, bearded fellow who, back in the 1950's and 1960's, would stand on a corner of Pacific Coast Highway in Laguna Beach waving at on-coming traffic.  Larsen became emblematic of Laguna Beach, and, according to Wikipedia, in 1964 was proclaimed by the mayor of Laguna Beach as the city's "official greeter."  There is now a statue of him in Laguna.

3

At that point, the Hossein-Mahmoud relationship became litigious. Mahmoud filed this action, case number 528149, on July 1, 1987. The case went to arbitration. The arbitration resulted in a formal arbitration decision written by then-retired Judge Warren Knight, filed in November 1989 (the "Knight judgment") which delineated the precise legal relationship between Hossein and his uncle Mahmoud. Judge Knight ascertained that there was only one partnership, the Hossein-Fouladi partnership, but Hossein had assigned half of his interest in that partnership to Mahmoud.[4]

More litigation ensued in the early 1990's.[5] In late 1990, a judgment was entered after a court trial in front of Judge Jack Mandel (the "Mandel judgment") declaring that Hossein "has agreed to pay" Mahmoud $175,000 "pursuant to" a typewritten agreement between Hossein and Mahmoud dated February 3, 1987, which was attached to the judgment. That document included language to the effect that Mahmoud would not only be "entitled to twenty-five percent of all net profits," but that he also "agrees to assume twenty-five percent of any losses incurred by the restaurants."

The Mandel judgment declared that, from then on, Hossein would owe Mahmoud "25% of the net profits of the Greeter Corner and C'est La Vie restaurants, and in no event shall [that] be less than 1/2 of . . . Fouladi's draw from said restaurants." The judgment also stated: "The Superior Court retains jurisdiction to determine amounts due in the future pursuant to this judgment and to enforce any part of this judgment."

Mahmoud apparently had to go to court one more time in what we might call the antique epoch of this case – the early 1990's – to press for his 25 percent of profits. An amended order after a referree's report filed September 1992 (the "Knox

---

[4]  Technically, as shown by the tax returns in our record for the period 2005 onward, there are two Hossein-Fouladi partnerships, one for each restaurant with its own partnership tax return. The difference, for purposes of this proceeding, is immaterial. When we refer to the "Hossein-Fouladi" partnership we refer to Hossein and Fouladi's management of both restaurants.

[5]  The appellant's appendix consists of six volumes pertaining to the recent accounting proceeding. The parties have spared us much of the details of the filings in the case from the 1989-1992 period, i.e., have not included them in either the appellant's or respondent's appendices but that does limit our ability to trace with more precision the early procession of the case.

judgment" named for the late Judge Robert Knox, referee at the time) required Hossein to pay to Mahmoud a sum of a little more than $37,000 for 1990 and a sum of a little more than $50,000 for 1991. But the 1992 Knox judgment added this gloss: Starting in 1993, Hossein was to send copies of the partnership tax returns to Mahmoud with an explanation of net income. Mahmoud would then have 30 days to object in writing if he disagreed with the "sum due," and if the parties could not agree on that sum within that 30 days, Mahmoud would have another 10 days to file with the referee "a motion for an order to pay based upon an evidentiary hearing." Otherwise Mahmoud would be deemed to have accepted Hossein's version of what was owed.

Fast forward to 2011, the next event in our record.[6] By this time the previous referee was no longer available, so Mahmoud applied to the court for appointment of a new referee. For reasons that are not entirely clear from the record, the new referee did not hold a hearing until June of 2014.[7]

It is the report from that hearing, and the ensuing adoption of most of it by the trial court in the judgment in this case (the "Miller judgment," after Franz Miller, the Orange County Superior Court judge who received the report from referee Smith) that has generated this appeal. The hearing encompassed Mahmoud's claims for profits from Greeter's Corner and C'est La Vie during the period 2005 through 2013 (inclusive). Hossein began the hearing behind in the count, since he acknowledged right off the bat that he hadn't paid anything at all to his uncle in the period 2005 to 2013, and agreed he owed $56,038.

---

[6] Both parties in their briefs allude to a 2005 case, Orange County Superior Court case No. 05CC09108, filed by Mahmoud against Hossein and Fouladi and the two restaurants. But that's all they do. They tell us nothing about it. On our own motion we have taken judicial notice of the complaint in case No. 05CC09108, which charges the defendants with having failed to pay profits since 2004. We also take judicial notice of the judgment in that case, filed in April 2006, sustaining demurrers without leave to amend and giving judgment in favor of Hossein. That judgment explains why the case before us covers the years 2005 through 2013 and not any earlier years.

[7] There does seem to have been some disagreement as to who, exactly, would be appointed as the new referee. Hossein objected to the retired judge who was eventually appointed as referee, Jack L. Smith, and that perhaps explains some of the delay. There are no issues on appeal concerning the validity of Smith's appointment.

5

It also didn't help Hossein that Mahmoud presented not just one, but two expert witnesses attacking the reliability of the Hossein-Fouladi partnership's accounting systems for the two restaurants. One of Mahmoud's experts, CPA James O'Leary, opined that the partnership's general ledger was unreliable, since he found discrepancies of $169,885 between what the general ledger said and what the tax returns indicated.[8] His other expert, restaurateur Kevin Johnson, faulted the partnership for using old-fashioned cash registers instead of a computerized "point of sale system." A point of sale system will track all funds, even tips and cash transactions. By contrast an old-fashioned cash register is susceptible to manipulation by allowing cash transactions to be unrecorded. Johnson too opined that the partnership's general ledger was "not reliable."

The main reason for the discrepancies in the ledger – a difference between what the tax returns showed as rent and what the ledger showed – became the major focus of the hearing. Fouladi is the landlord for Greeter's Corner,[9] as well as having a 50 percent partnership interest in the two restaurants. Much of the hearing thus centered on a fairly unusual landlord-tenant arrangement between the Hossein-Fouladi partnership for Greeter's Corner and Fouladi in his role as the landlord: The partnership would write rent checks but they would not be cashed unless there was money in the account. It might be years before the rent checks would be cashed – if ever. In fact, during the hearing, Hossein admitted there was a period of three-and-one-half years in which Greeter's Corner partnership rent checks were simply never cashed. Hossein argued (and continues to argue on appeal) that Fouladi's forbearance in cashing the checks was a mere cash-flow device by which Fouladi was loaning the restaurants money when cash was not available.

---

[8]  O'Leary testified that a general ledger is simply a compilation of all transactions of the business.

[9]  Technically, the landlord is his wholly owned corporation Anugal, Inc. Though we will refer to Fouladi as the landlord to clarify the relationship between the parties, it should be understood that we are not opining in any way that Anugal is Fouladi's alter ego.

On the other hand, the fact the checks weren't cashed did not stop the Hossein-Fouladi partnership from including all the checks *written* in a given year as rent expense on that year's partnership tax returns. At the hearing Mahmoud's counsel repeatedly confronted Hossein with the fact that only a certain relatively low amount of rent checks had been cashed during a given year, but the tax returns claimed all rent checks written in that year as deductible expenses.[10]

Hossein's response to these questions did not inspire confidence. Every time he was asked to explain the discrepancy between the total of rent checks actually cashed in a given year and what the tax returns said, he simply said, "I don't know." An expert witness appearing for Hossein, CPA Jaime Holmes, maintained that deducting all checks written in a given year was perfectly legitimate, even in light of the partnership's use of a "cash" – as distinct from "accrual" – basis accounting system. Holmes opined that the partnership had "relinquished control" over the funds when it wrote each check.

Hossein, however, presented no evidence that Fouladi himself, in his role as landlord of Greeter's Corner, had included into his own taxable income the uncashed rent checks the Greeter's Corner partnership was deducting. To be sure there was, on cross-examination, an extended contretemps between Mahmoud's counsel and CPA Holmes over the point. But the most that Holmes was able to say to support his belief that Fouladi had included uncashed checks on his own income tax returns was that he had been *told* that by the preparer of the partnerships' tax returns, a CPA by the name of Carl Rizzo. Holmes ultimately admitted he never saw a source document establishing that Fouladi actually paid tax on what the Greeter's Corner partnership had deducted. Neither Rizzo nor Fouladi testified at the hearing.

---

[10]    For example, for the year 2013 for Greeter's Corner, only $28,287.25 worth of rent checks were cashed, and *those* had been written back in 2009 and 2011, but the partnership's tax returns claimed $135,608 as deductions for rent.

The hearing also elicited evidence that the Greeter's Corner partnership had loaned Hossein himself $42,000 and also loaned Hossein's sister (a manager at C'est La Vie) $70,000, for a total of $112,000. Referee Smith thought the loans should be characterized as partnership profits, and his initial report proposed to give Mahmoud half ($56,000) of that amount. Judge Miller, however, recognizing that a portion of those loans had actually been paid back, reduced the total award based on the loans to $28,218.75. (This later figure includes interest. There is no issue in this appeal as to the math, i.e., whether the trial court correctly computed the amounts paid back.)

Overall, the trial court awarded a total of $244,841.75, though much of that was interest at 7 percent. The constituent parts of the judgment (interest included) were: $10,787 for the cost of the referee (a sum already advanced by Mahmoud), $152,989 (including interest) for Mahmoud's 25 percent share of the profits over the period 2005 to 2013 (calculated to be $112,138); $63,634 as Mahmoud's share of outstanding uncashed rent checks (the total being $224,698) and $28,218.75 as Mahmoud's share of the outstanding loans to Hossein and his sister.

We note that in figuring the $152,989 awarded for profits over the period 2005 through 2013, the referee did not subtract rather substantial losses shown on the partnership's tax returns for the years 2011 and 2012. Specifically, Greeter's Corner reported a $91,725 loss for 2011, though C'est La Vie reported $49,550 in income. For 2012, both restaurants reported losses: C'est La Vie reported an $80,935 loss while Greeter's Corner reported a $101,297 loss. Rather the referee's report simply declared zero profits where there were losses in those years.

Hossein has timely appealed from the judgment. He does not challenge the $10,787 component for the cost of the referee.

## III. DISCUSSION

A. *The Loans*

Loaning money to yourself or a family member that might have otherwise been recognized as taxable profit has been used as a tax dodge. (See *Busch v. C.I.R.* (7th Cir. 1984) 728 F.2d 945 (*Busch*) [generally discussing tax law on whether withdrawals from corporations should be treated as loans or taxable dividends].) Thus, it is a major component of tax law that when the taxpayer is in control of the entity doing the lending, the transaction is subject to *particular scrutiny* because of the opportunity to finagle a fictional debt. (*Matter of Uneco, Inc.* (8th Cir. 1976) 532 F.2d 1204, 1207.)

Accordingly, federal appellate courts have developed a framework of factors bearing on when a loan is really a loan and when it's really disguised profit. (See *Busch, supra*, 728 F.2d at p. 948.) While the factors enunciated by the various circuit courts can vary slightly, we will start – if only because of the location of this litigation – with the Ninth Circuit's factors, which are: (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan. (*Welch v. C.I.R.* (9th Cir. 2000) 204 F.3d 1228, 1230.)

The Ninth Circuit's list largely parallels the factors enunciated by (at least) the Fifth, Sixth, Seventh and Eighth Circuits as well. (See *Alterman Foods, Inc. v. United States* (5th Cir. 1974) 505 F.2d 873, 878-79 (*Alterman Foods*); *Dietrick v. C.I.R.* (6th Cir. 1989) 881 F.2d 336, 340 (*Dietrick*); *Berthold v. C.I.R.* (6th Cir. 1968) 404 F.2d 119, 122; *Busch, supra*, 728 F.2d at p. 948; and *Matter of Uneco, Inc.*, *supra,* 532 F.2d at p. 1207.) We note, though, that these courts have divined two further factors which, we think, also shed light on whether a transfer of money is really a loan or whether it is

9

disguised profit:  (8) whether there was a *business reason* for the entity to make the loan and (9) whether the purported borrower would still be on the hook to *repay* the loan if the entity making the loan failed.  (See *Dietrick, supra,* 881 F.2d at p. 340; *Alterman Foods, supra,* 505 F.2d at pp. 878-879.)

Applying these factors, the referee's decision to recharacterize as profits the outstanding unpaid loan balances of Hossein and his sister readily passes muster.  (Cf. *Busch, supra*, 728 F.2d at p. 950 [upholding tax court decision that loans were taxable dividends even where there was complete repayment because the tax court re-characterization was not "clearly erroneous."].)  There was no note, or at least no note put into evidence by Hossein.  While there was Hossein's testimony his sister was paying interest, there was no evidence *he* was.  There was clearly no fixed repayment schedule.  There was no collateral.  The repayments, when made, were irregular.  There were no business reasons for either loan:  The Hossein-Fouladi partnership operates restaurants, not banks.  There was nothing to indicate that, if the restaurants ever did fail, Hossein or his sister would be on the hook for repayment.

And perhaps most dispositively, the loans were being made at a time when the restaurants were so cash-strapped – if one were to believe Hossein's own theory about the rent checks – that the landlord was not cashing them.  It doesn't take an MBA to know that giving yourself a somewhat amorphous loan at a time when you can't make the rent payments will raise eyebrows.  We cannot second-guess the referee's conclusion the loans taken out by Hossein for himself and his sister were actually concealed distributions of profit.

B.  *The Uncashed Rent Checks*

As noted, much of the hearing was taken up with Mahmoud's attorney confronting Hossein with the difference between the deductions for the rent the Hossein-Fouladi partnership *actually took on its tax returns* in a given year and the much lower

10

actual rent checks that were presented to the bank and honored in that same year. The CPA's for each side dueled over the nature of cash versus accrual accounting systems and whether the restaurants were entitled to deduct the checks *written* in one year but not cashed (if ever) until later years.[11] The experts differed over whether a check written in one year and cashed in another year can count as a deduction from income in the year when it is written under a cash accounting system.

On appeal, Mahmoud basically cites the IRS regulation that – "as a general rule" (to quote the regulation itself) allowable deductions are taken in the taxable year when they are paid (see 26 C.F.R. § 1.461-1). He couples the regulation with the well-known fact checks are not actually paid until the bank pays them. (E.g., *Holden v. C.I.R.* (2015) 110 T.C.M. (CCH) 53 [2015 Tax Ct. Memo LEXIS 140] at p. 17 [because taxpayer used cash accounting, it could not deduct check written on December 31 of 2007 on its 2007 returns].)

But the issue is a little more complex than just those two points of tax law. For example, people who write checks for charitable contributions at the end of the calendar year have long been protected by the "relation back" doctrine just in case the charity doesn't cash those checks until January of the following year. (See *Estate of Spiegel v. C.I.R.* (1949) 12 T.C. 524, 527.)

However, by Hossein's own version of events, the uncashed rent checks were clearly not deductible expenses. Hossein's opening brief proffers the theory that the rent checks were only cashed "when there is available cash to cover payment of those checks," so that, in effect, Fouladi's forebearance on cashing the checks was, in Hossein's phrase on appeal, an "*ad hoc* line of credit from the landlord." (App. Opn. br.

---

[11] Ostensibly, the Hossein-Fouladi partnerships use a "cash" system of accounting, as attested by their partnership tax returns. There's a box on the form 1065 partnership tax return right under the name of the taxpayer where one checks either "cash" or "accrual" or "other" and in every case "cash" was checked.

at p. 22.)  Hossein all but comes out and says the checks were written when there were insufficient funds to cover them.

Hossein's admission has consequences.  It means the uncashed rent checks weren't deductible as a matter of tax law.  As the tax court recently explained, deductions cannot be taken "where the payee knows the payor has insufficient funds and therefore refrains from cashing the check."  (*Vanney Associates, Inc. v. C.I.R.* (2014) 108 T.C.M. (CCH) 265 [2014 Tax Ct. Memo LEXIS 182] at p. 2; see *Barrow v. C.I.R.* (2008) 96 T.C.M. (CCH) 361 ["We have held that when a payee knows there are insufficient funds and that knowledge causes him to refrain from cashing a check, the payment is income to him in the later year rather than the earlier."].)  In characterizing the unpaid rent checks as profit and not rent, the referee was only doing what the IRS would have done if *it* had gotten the case.

C.  *Profit and Loss*

The referee gave Hossein no credit for any of the losses incurred by Greeter's Corner (in 2011 and 2012) or C'est La Vie (in 2012), though the respective tax returns showed substantial losses:  The net losses in those recession years was, if our math is correct, greater than $222,000.  Yet the referee's figures only accorded two zeros for each of those years.  On appeal, Hossein points to his February 1987 written contract with Mahmoud – which plainly says Mahmoud is responsible for all the losses incurred by the two restaurants as well as being entitled to their profits – and claims the judgment is in error.

This is where it gets a little problematic.  Preliminarily, we first agree with Hossein that the February 1987 agreement does indeed make Mahmoud responsible for loss as well as entitled to profit.  A quick history of the relevant controlling judgments is in order.

The Knight judgment made clear that while Hossein was not Fouladi's partner, Mahmoud's interest in the restaurants was derivative of Hossein's 50 percent

12

partnership interest. Judge Knight's rationale was that Hossein's interest in the Hossein-Fouladi partnership was personal property, partially assignable to Mahmoud, and that the February 1987 agreement between Hossein and Mahmoud operated as such an assignment. The February 1987 agreement was plain that it entailed loss as well as profit. The Mandel judgment then implemented the Knight judgment in concluding that profits for the years 1987, 1988 and 1989 were 25 percent Mahmoud's. The Knox judgment followed, did the same thing for the years 1990 and 1991, and set up the system of sending each year's tax returns to Mahmoud for review.

But despite the Mandel judgment's apparent recognition that Mahmoud is responsible for loss as well as entitled to profit, Hossein does not prevail on this record. Even though the Mandel judgment attached the February 1987 agreement as an exhibit, the Mandel judgment itself changed the basic divvy between Mahmoud and his nephew Hossein from what it was in the agreement, which might be described as "profit *and* loss" to something that might be better described as "profit and *maybe* loss, but loss only if Fouladi doesn't take any money out of the restaurants." The precise language in the Mandel judgment was this: "After full satisfaction of the $175,000, all future profits due and owed plaintiff [Mahmoud] by defendant, Abassi [*sic*[12]] are determined as 25% of the net profits of the Greeter Corner and C'est Las Vie restaurants, *and in no event shall be less than 1/2 of Taghi Fouladi's draw from said restaurants.*" (Italics added.)

To be sure, the Mandel judgment's in-no-event-shall-be-less clause poses, on analysis, a hardship to Hossein. On its face, it says that if Fouladi receives a draw from the restaurants then Mahmoud is entitled to half of that amount, and the clause makes no allowance for loss years. It is as if Fouladi was being required to live on

---

[12]      Both plaintiff and defendant had the same last name and the Mandel judgment uses "Abassi" to refer to both parties. This was not the most felicitous drafting, though to be sure the judgment was actually prepared by Mahmoud's counsel at the time. However, in this context, the Abassi must necessarily refer to defendant *Hossein*, which is the only way it makes syntactical sense. That is, the drafter simply forgot that "Abassi" here was being used as an appositive clause and forgot to set off "Abassi" with commas at both ends of the clause.

13

personal savings during loss years.  In that regard, perhaps, back in 1990 when the Mandel judgment was filed, no one ever thought of the possibility of losses, and so no one posed the question of how the no-less-than clause in the Mandel judgment would interact with the loss clause in the 1987 agreement.  But whatever its deficiencies, the 1990 Mandel judgment is long-time res judicata, and we cannot rewrite that judgment to make it more equitable to Hossein.  That opportunity had passed by the time Bill Clinton was elected.

Strictly speaking, the hearing conducted by referee Smith did not produce any evidence that Fouladi took any "draws" – that is, draws denominated as such.  The only evidence at the hearing bearing on a possible draw was that Hossein testified he and Fouladi took *salaries* of $2,000 a month for the period 2005-2013.

Under the doctrine of implied findings, however, we must conclude the referee *impliedly* found that Fouladi's $2,000 a month salary was *substantively* a draw. (*Brewer v. Carter* (2013) 218 Cal.App.4th 1312, 1320 ["Under the doctrine of 'implied findings,' if the record is silent, we must presume the trial court fully discharged its duty to consider all of the relevant statutory factors and made all of the factual findings necessary to support its decision for which there is substantial evidence."].)  And so the question we are now faced with is whether the referee's finding was supported by substantial evidence.  (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 293 [implied findings are reviewed for substantial evidence].)

Black's Law Dictionary (10th ed. 2014) defines "draw" (in the economic sense) as:  "To take out (money) from a bank, treasury, or depository <she drew $6,000 from her account>."  (P. 601, col. 2.)  Typically, "draws" are advances against expected partnership profits.  (E.g., *Robbins v. C.I.R.* (1967) 26 T.C.M. (CCH) 34, fn. 2.)

14

Salaries are slightly different. Black's Law Dictionary defines "salary" as compensation for services. (Black's Law Dict. (10th ed. 2014) p. 1537, col. 1.) Likewise, the Government Code.[13]

And here is where the record before us makes all the difference in the world. Appellants, of course, must affirmatively show error on the record before the appellate court. (E.g., *In re Marriage of Obrecht* (2016) 245 Cal.App.4th 1, 8) Very possibly Hossein might have shown that Fouladi's $2,000 a month salary really was a salary (and a pretty small one at that[14]). But he didn't. As an equity owner, Fouladi would normally have been entitled to a draw against the prospective profits of the restaurants, not receive "salary" paid as if he were an employee. And Hossein fails to show that Fouladi's $2,000 a month salary was linked to any services rendered. Fouladi did not testify. Fouladi's personal tax returns were not offered into evidence. For all *we* know in this appeal, Fouladi might have been paid $2,000 a month for lounging on the beach while the restaurants operated on auto-pilot.

The only consolation we can offer to Hossein in this regard is that, as we read the Mandel judgment, the referee might have added another $24,000 to Mahmoud's award by virtue of the two loss years (two times $24,000 a year divided by two). Mahmoud, however, has not challenged that aspect of the judgment, so we merely affirm the amount the referee did award.

D. *Prejudgment Interest*

The judgment also provides for 7 percent prejudgment interest. Hossein objects to this provision arguing the amounts were not capable of being made certain – the standard for an award of prejudgment interest. (See Civ. Code, § 3287.) His

---

[13] Other statutes tether salaries to services. (See e.g., Gov. Code, § 18000 ["The salary fixed by law for each state officer, elective or appointive, is compensation in full for that office and for all services rendered in any official capacity or employment whatsoever . . . ."].) And thus salaries cannot *necessarily* be equated with draws. (E.g., *Helmer v. Bingham Toyota Isuzu* (2005) 129 Cal.App.4th 1121, 1124, fn. 1 [compensation package envisioned draws on top of base salary].)

[14] It works out to less than $15 an hour for 40 hours a week, 52 weeks a year.

15

conceptual error is that he confuses legal uncertainty with bookkeeping uncertainty. Once there was a legal determination that the loans and uncashed checks were really disguised profits, there was no lack of certainty in ascertaining the numbers. An unpaid fee to a referee (certain from a bill), loans made by the restaurants (just add them up), and amounts of checks uncashed (as certain as looking at a bank statement) were all readily ascertainable.

E. *Miscellaneous and Waived Issues*

In conclusion, we summarily address a few points presented in the opening brief, so undeveloped conceptually as to have been made practically as afterthoughts. Hossein's point that the referee's report was "advisory only" establishes nothing. Judge Miller obviously looked at it and did his own thinking in adding back the amounts of the loans that had been repaid; he was entitled to take "advice" from the report. Hossein's assertion the referee's report "contains numerous errors" borders on the frivolous since he does not otherwise specify those errors. And in any event if there are errors not otherwise specified in the brief, Hossein has failed to show he brought them to the referee's attention. Furthermore, Hossein's argument the hearing was beyond the scope of the reference provided for in the early judgments (because it delved into "internal partnership affairs") has not only been waived but is also borderline frivolous on the merits. Since the Knight, Mandel and Knox judgments all establish that Mahmoud is entitled to 25 percent of the net profits from the restaurants, it logically follows that the internal affairs of the partnership had to be looked into.

## IV.  DISPOSITION

The judgment is affirmed.  Mahmoud will recover his costs on appeal.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

FYBEL, J.

17