ANTHONY A. MITCHELL AND DOROTHY M. MITCHELL, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Mitchell v. Commissioner
Docket Nos. 7559-92, 7560-92, 7561-92
United States Tax Court
T.C. Memo 1994-242; 1994 Tax Ct. Memo LEXIS 250; 67 T.C.M. (CCH) 3027; May 31, 1994, Filed *250 For petitioners: Thomas F. Greaves and Jack D. Farris. For respondent: June Y. Bass and Valerie N. Larson. RUWE
RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to taxes as follows: Anthony A. Mitchell and Dorothy M. Mitchell docket No. 7559-92 Additions to Tax
TYE
Deficiency
Sec. 6653(b)(1) Sec. 6661 Sec. 6621(c) 12/31/88
$ 180,631
$ 135,473
$ 45,158
120 percent of
interest due on
$ 180,631
Pro-Line Paint Co.
docket No. 7560-92
Additions to Tax
TYE
Deficiency
Sec. 6653(b)(1)(A)
Sec. 6653(b)(1)(B)
Sec. 6661
7/31/88
$ 129,125
$ 96,844
50 percent of
$ 32,281
interest due on
$ 129,125
San Diego Coatings Co.
docket No. 7561-92
Additions to Tax
TYE
Deficiency
Sec. 6653(b)(1)(A)
Sec. 6653(b)(1)(B)
Sec. 6661
7/31/88
$ 44,436
$ 84,807
50 percent of
$ 39,378
interest due on
$ 113,076
After concessions, the issues for decision are: (1) Whether $ 700,000 received by Anthony A. and Dorothy M. Mitchell from Pro-Line Paint Co. and San Diego Coatings Co. should be characterized *251 as constructive dividends or as loans; (2) whether Anthony and Dorothy Mitchell, Pro-Line Paint Co., and San Diego Coatings Co. are liable for additions to tax for fraud and for substantial understatements of tax as determined by respondent; and (3) whether Anthony and Dorothy Mitchell are liable for increased interest on substantial underpayments attributable to tax-motivated transactions as determined by respondent. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the period in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. At the time of filing the petitions herein, Anthony and Dorothy Mitchell's legal residence was in Zephyr Cove, Nevada, and the principal place of business for Pro-Line Paint Co. FKA San Diego Coatings Co. was in San Diego, California. During the period at issue, Pro-Line Paint Co. and San Diego Coatings Co. were California corporations. Unless otherwise indicated, the term *252 petitioner shall refer to Anthony A. Mitchell, the term petitioners shall refer to Anthony A. and Dorothy M. Mitchell, and the term corporations shall refer to Pro-Line Paint Co. and San Diego Coatings Co. Petitioner incorporated San Diego Coatings Co. in 1961 and Pro-Line Paint Co. in 1962. During the period in issue, petitioners were officers, directors, and controlling shareholders of the corporations. [2] Mr. Ernolff Soeterik was an officer and director of San Diego Coatings Co., [3] and Mr. Frank Baptista was an officer and director of Pro-Line Paint Co. [4]
*253 San Diego Coatings Co. manufactured paint, and Pro-Line Paint Co. sold paint and similar products acquired from San Diego Coatings Co. and other companies. Petitioner was involved in the day-to-day activities of the corporations, and he established the corporations' overall business policies and developed the business plans regarding paint manufacturing, research, and development. Mrs. Mitchell was responsible for many of the record-keeping functions of the corporations, including preparing payroll summaries, recording disbursements and deposits, supervising employees who assisted in maintaining the corporate records, and delivering the corporate records to the corporations' accountants. At various times, petitioner, Mr. Baptista, and Mr. Soeterik would borrow money from the corporations. Such loans were reflected in the corporations' financial records. Loans to petitioner were designated as loans to shareholder. Loans to Mr. Baptista and Mr. Soeterik were recorded as employee loans. Petitioner was a licensed pilot. Until April 13, 1988, the corporations each owned a one-half interest in a Cessna Citation II aircraft (Cessna), which had been acquired in 1983. On March 18, *254 1988, Mr. Brian Kay offered to purchase the Cessna for $ 1,750,000. Mr. Kay's offer was accepted. On April 13, 1988, petitioner executed an Aircraft Bill of Sale for the Cessna. Each corporation was entitled to one-half of the $ 1,750,000 derived from the sale of the Cessna. Petitioner instructed Mr. Kay to pay the purchase price by means of two cashier's checks. Pursuant to petitioner's instructions, one cashier's check dated April 13, 1988, was made payable to Pro-Line Paint Co in the amount of $ 1,075,000. On April 18, 1988, Mrs. Mitchell deposited the $ 1,075,000 cashier's check in Pro-Line Paint Co.'s investment account. The other cashier's check, also dated April 13, 1988, was made payable to petitioner personally in the amount of $ 700,000. [5]
The total amount of the Cessna sales proceeds as recorded in the corporations' *255 books for the tax year ended July 31, 1988, and as reported on their 1988 Forms 1120 (U.S. Corporation Income Tax Return) was $ 1,075,000. The sales price of the Cessna was understated on the corporations' tax returns by $ 675,000. [6] The $ 700,000 paid directly to petitioner was not recorded in any of the corporations' records for the tax year ended July 31, 1988. On April 18, 1988, petitioner deposited the $ 700,000 cashier's check into a Swiss bank account which he had opened on February 25, 1988. During 1988, total dividend and interest earnings from petitioner's Swiss bank account were $ 42,215. Petitioners did not report the $ 700,000 paid directly to petitioner or the $ 42,215 of total earnings from petitioner's Swiss bank account on their 1988 joint *256 Federal income tax return. During 1989, total dividend and interest earnings from petitioner's Swiss bank account were $ 32,918. During 1990, total interest earnings from petitioner's Swiss bank account were $ 26,748. Petitioners did not report the 1989 and 1990 earnings from petitioner's Swiss bank account on their 1989 and 1990 joint Federal income tax returns. On their 1988, 1989, and 1990 joint Federal income tax returns, petitioners affirmatively denied having a foreign bank account. Line 10 of Part III (Foreign Accounts and Foreign Trusts) of Schedule B (Interest and Dividend Income) of Form 1040 requires disclosure of any "interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)". On petitioners' 1988, 1989, and 1990 Form 1040, line 10 of Schedule B was marked "No". On June 18, 1991, Revenue Agent Zulema I. Liotta notified Mrs. Mitchell that Pro-Line Paint Co.'s 1988 tax return was under audit. On December 16, 1991, Revenue Agent Liotta extended the scope of the audit to include San Diego Coatings Co.'s tax return for the tax year ended July 31, 1988, as well *257 as petitioners' 1988 joint Federal income tax return. As early as July 19, 1991, Revenue Agent Liotta first requested that petitioners provide documentation regarding the sale of the Cessna. Throughout the course of the audit, Revenue Agent Liotta made several additional requests for documentation regarding the sale of the Cessna, including specific requests for information regarding the $ 700,000 paid directly to petitioner. Notwithstanding Revenue Agent Liotta's repeated requests, petitioners did not disclose during the course of the audit that the $ 700,000 had been deposited in a Swiss bank account, or that on October 10, 1991, petitioner authorized the liquidation of his Swiss bank account. As a result, the notice of deficiency for the taxable year 1988 issued to petitioners on March 27, 1992, did not include a deficiency for the tax due on the interest and dividends earned from petitioner's Swiss bank account. OPINION I. Constructive Dividends or Loans
Respondent contends that petitioners received $ 700,000 of constructive dividends from the corporations.[7] Petitioners contend that the $ 700,000 should be characterized as loans from the corporations. Respondent's *258 determination is presumed correct, and petitioners bear the burden to establish that it is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under sections 301(c) and 316(a), distributions of property made by a corporation to a shareholder with respect to its *259 stock are taxable to the shareholder as ordinary income (i.e., as a dividend) to the extent of the earnings and profits of the corporation. Sec. 301(c)(3). The parties agree that during the period at issue the corporations' earnings and profits equaled or exceeded $ 700,000. Dividends may be formally declared or they may be constructive. Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84 ("The fact that no dividends are formally declared does not foreclose the finding of a dividend-in-fact."). Whether a distribution of funds from a corporation is characterized as a dividend or as a loan depends on whether the corporation has conferred a benefit on the shareholder without expectation of repayment. Noble v. Commissioner, supra at 443; Estate of Chism v. Commissioner, 322 F.2d 956, 959-960 (9th Cir. 1963), affg. T.C. Memo. 1962-6; Clark v. Commissioner, 266 F.2d 698, 710-711 (9th Cir. 1959); see also Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), *260 affg. T.C. Memo. 1983-98; Alterman Foods, Inc. v. United States, 505 F.2d 873, 875-876 (5th Cir. 1974). While a shareholder's declared intention to repay is one factor to be analyzed, it is not determinative. Busch v. Commissioner, supra at 948. The surrounding facts and circumstances of the transaction must be fully examined to determine its economic and financial realities. Busch v. Commissioner, supra; Estate of Chism v. Commissioner, supra at 959-960; Clark v. Commissioner, supra at 710-711. After reviewing the facts and circumstances surrounding the transaction before us, we find that petitioners have not overcome respondent's presumption of correctness. First, the transaction lacks all the conventional indicia of debt. For example, the purported loan was not evidenced by a promissory note, no interest payments were made or required, no security arrangements were provided or required, and there was no formalized repayment schedule. See Busch v. Commissioner, supra at 948; *261 Clark v. Commissioner, supra at 711. Second, the purported loan was not recorded in the corporate records. Busch v. Commissioner, supra. This fact particularly weighs against petitioners since it was the practice of their corporations to record loans to shareholders. Third, petitioners were controlling shareholders of the corporations. Thus, petitioners had no fear that the corporations would demand repayment. See Busch v. Commissioner, supra at 951; Clark v. Commissioner, supra.While petitioners ultimately repaid the $ 700,000 to the corporations, the payment was made after respondent had informed Mrs. Mitchell that Pro-Line Paint Co.'s 1988 tax return was under audit and inquired about the sale of the Cessna. See Busch v. Commissioner, supra at 950 (repayments made after being informed of an audit are not determinative of intent). Petitioners testified that they intended to repay the $ 700,000 when the corporations needed the funds or by 1995 at the latest. Petitioner paid $ 700,000 to Pro-Line Paint *262 Co. on October, 11, 1991. [8] To make this payment, petitioner closed his Swiss bank account on October 10, 1991. Petitioner made the following request that the closure of his Swiss bank account be expedited: Please instruct Overland Bank, Zurich, to close account No. 534.595 Euroair Foundation as soon as possible. This will involve: a. liquidation of a Deutschmark Fiduciary Time Deposit, which can be done immediately; b. early liquidation of US$ certificate of deposit due October 25, 1991, which can be done immediately; c. redemption of Hambros Currency Fund as soon as possible; d. currency balances in SFR and US$ current accounts. Please request Overland Bank to pay items a. and b. above immediately by wire transfer * * * * * * Items c. and d. should be paid in the same manner as soon as possible. Petitioners have provided us with no evidence *263 that Pro-Line Paint Co. was in need of the $ 700,000 at the time the Swiss bank account was closed. Indeed, Pro-Line Paint Co.'s Form 1120 for the tax year ended July 31, 1991, Schedule L (balance sheets), discloses current assets of $ 3,832,065 -- including cash of $ 1,692,264 -- and current liabilities of $ 780,049. Given the proximity of the closure of the foreign account to the audit of Pro-Line Paint Co., the lack of evidence regarding Pro-Line Paint Co.'s need for the funds, and the urgency in petitioner's closure request, we find more convincing respondent's argument that the repayment was made because of respondent's examination. Petitioners argue that their past practice of repaying loans is indicative of their intent to repay the $ 700,000. While past practice is a factor to be considered, we put little weight on it here because corporate loans made to petitioner in the past were recorded on the corporate records. Since petitioners were the controlling shareholders of the corporations, we look with great care to the surrounding facts and view with some suspicion petitioners' declarations of intent. See Alterman Foods, Inc. v. United States, 505 F.2d at 877; *264 Clark v. Commissioner, 266 F.2d at 711. For 2- 1/2 years, from April 1988 when petitioner asked for and received the $ 700,000 cashier's check and transferred it to his Swiss bank account, until October 1991 when the revenue agent was conducting her examination and inquiring into the sale of the Cessna, nothing in the corporate records reflected the existence of corporate loans to petitioner. Based on the record before us, we find that petitioners have failed to overcome respondent's presumption of correctness. [9] Therefore, we sustain respondent's determination that the $ 700,000 petitioners received on the sale of the Cessna constitutes dividends. *265 II. Section 6653(b) Fraud
Respondent determined that the underpayment of taxes for 1988 was due to petitioners' and the corporations' fraudulent intent to evade tax. Section 6653(b)(1) provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud. Respondent has the burden of proving by clear and convincing evidence that an underpayment exists for the periods in issue and that some portion of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b); Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989); Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir. 1987), affg. T.C. Memo. 1986-223; Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989). Respondent must first prove by clear and convincing evidence that an underpayment exists for the periods in issue. Thus, respondent cannot rely on the presumption of correctness for purposes of section 6653(b)(1). Here, respondent must prove *266 by clear and convincing evidence that petitioners' failure to report the $ 700,000 as income on their 1988 joint Federal income tax return resulted in an underpayment of tax. Petitioners have conceded underpayments by the corporations. See supra note 7. We find that respondent has proven by clear and convincing evidence that petitioners underpaid their tax for 1988. Petitioner's actions, beginning with his request that Mr. Kay pay for the Cessna with two separate cashier's checks to his actions during respondent's examination, show by clear and convincing evidence that the $ 700,000 was not a loan. The $ 700,000 paid directly to petitioner was not recorded in any of the corporate records or petitioners' personal records. The sales proceeds of the Cessna were understated by $ 675,000 on the corporations' 1988 corporate tax returns. The $ 700,000 paid to petitioner was not evidenced by a promissory note, no interest payments were made or required, no security arrangements were provided or required, and there was no formalized repayment schedule. After specifically requesting and receiving the cashier's check for $ 700,000, petitioner endorsed and deposited it into a newly *267 opened Swiss bank account. Petitioners did not report the earnings from the Swiss bank account on their 1988, 1989, or 1990 joint Federal income tax returns even though total earnings from the Swiss bank account for these 3 years were $ 101,881. Petitioners affirmatively denied on their 1988, 1989, and 1990 tax returns that they had any foreign bank accounts. The sequence of events after the revenue agent initiated her audit, provide further support for our conclusion that when the $ 700,000 was diverted to petitioner's Swiss bank account, petitioners did not intend to repay the $ 700,000 and were attempting to cover up the facts surrounding the 1988 diversion. (1) During the tax year ended July 31, 1988, the corporations did not maintain minutes of the meetings of the corporations' board of directors. Sometime near the end of July 1991 the corporations' minutes were backdated providing that the sales price of the Cessna was $ 1,075,000. [10]
*268 (2) On October 8, 1991, minutes were prepared providing that the minutes in the year of sale did not reflect the correct sales price of the Cessna of $ 1,750,000 and that petitioner borrowed $ 700,000. (3) In a letter dated October 10, 1991, petitioner authorized the closure of his Swiss bank account and expressed an urgent need for the funds. (4) On October 11, 1991, petitioner executed a personal check in the amount of $ 700,000 made payable to Pro-Line Paint Co. and, also on that same date, the $ 700,000 check was deposited into Pro-Line Paint Co.'s account. (5) On October 18, 1991, petitioners' agent sent Revenue Agent Liotta the corporations' amended tax returns disclosing the correct sales price of the Cessna. (6) On November 7, 1991, approximately 1 month after petitioner had liquidated his Swiss bank account, Revenue Agent Liotta requested documentation regarding the sale of the Cessna, including information relating to the deposit of the sale proceeds. [11] On November 12, 1991, Revenue Agent Liotta again requested documentation regarding petitioners' 1988 deposit of the $ 700,000. On November 19, 1991, petitioners' accountant provided a copy of the 1988 cashier's check *269 for $ 1,075,000, a copy of a telegram from Mr. Kay confirming the purchase price of $ 1,750,000, and a copy of a deposit into Pro-Line Paint Co.'s account made on October 11, 1991, in the amount of $ 700,000. No information was provided to Revenue Agent Liotta regarding the $ 700,000 deposit to petitioner's Swiss bank account in 1988. (7) On November 22, 1991, Revenue Agent Liotta again requested documentation reflecting the receipt of the $ 700,000 in 1988. In response to Revenue Agent Liotta's letter, on November 25, 1991, petitioners' accountant stated the following: As we stated in our letter of November 19, 1991 we have provided all of the documentation that we have at this time. * * * We have been *270 informed that there has been no taxable interest, dividends or other income on the original deposit of $ 700,000. * * *
Respondent must also prove by clear and convincing evidence that some portion of the underpayment is due to fraud. To meet this burden, respondent must show that petitioners and the corporations intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Powell v. Grunquist, 252 F.2d 56, 60-61 (9th Cir. 1958); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraudulent intent by the corporations is determined by the acts of its officers -- a corporation has no intent separate from those who control it. King's Court Mobile Home Park v. Commissioner, 98 T.C. 511, 516 (1992). Petitioner was the principal officer of the corporations, and petitioners were the controlling shareholders. Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. United States v. Walton, 909 F.2d 915, 926 (6th Cir. 1990); Petzoldt v. Commissioner, 92 T.C. at 698. *271 Fraud is not to be presumed. Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25. The existence of fraud is a factual question to be determined from all the facts and circumstances contained in the record. King's Court Mobile Home Park v. Commissioner, supra at 516. Since direct proof of intent is rarely available, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts. Spies v. United States, 317 U.S. 492 (1943); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. The various kinds of circumstantial evidence analyzed by courts include: (1) Understatement of income, (2) inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealing assets, and (5) failure to cooperate with tax authorities. See Bradford v. Commissioner, supra and the cases cited therein. We find that petitioner and the corporations intended to evade taxes *272 known to be owing. Petitioner and the corporations understated their income with respect to the sale of the Cessna. During the period at issue, the $ 700,000 portion of the sales proceeds that was paid directly to petitioner was not recorded in the corporations' records or petitioner's personal records. After receiving notice of respondent's examination, in an attempt to document the sale, the corporations' minutes were backdated providing that the Cessna was to be sold for $ 1,075,000. Furthermore, the logical conclusion to be drawn from petitioner's behavior and from his implausible explanations of that behavior is that he intended to conceal the existence of the $ 700,000. Petitioner directed Mr. Kay to pay for the Cessna with two separate cashier's checks, one made payable to petitioner personally in the amount of $ 700,000, and the other made payable to Pro-Line Paint Co. in the amount of $ 1,075,000. The $ 700,000 paid to petitioner was not reported on the corporations' 1988 tax returns. The $ 700,000 was not reported in any of the corporations' records. Petitioner contends that the corporations' failure to report the $ 700,000 as sale proceeds and to record the $ 700,000 *273 as a loan to him was due to the error of his accountants. In support of this, Mrs. Mitchell testified that in 1988 she told Mr. Joseph Palermo, an employee of the John Collura Accountancy Corp. who did all of the corporations' bookkeeping, that the total sales price of the Cessna was $ 1,750,000 and that the corporations loaned $ 700,000 to petitioner. Mrs. Mitchell also testified that she gave Mr. Palermo a deposit slip reporting the deposit of $ 1,075,000, but no records regarding the $ 700,000. Mr. Palermo testified that he did not recall receiving information about the $ 700,000 from Mrs. Mitchell. During formal pretrial discovery, respondent served written interrogatories on each of the corporate petitioners. One of the questions asked in each set of interrogatories was: State each and every fact that the petitioner or its employees provided to the John R. Collura Accountancy Corporation for purposes of reporting the gain on the sale of the Cessna Citation airplane for federal income tax purposes.
The answers provided by each corporate petitioner indicated that no information was given to the return preparer prior to preparation of the original corporate returns *274 for the tax year ended July 31, 1988, that disclosed that the true sales price was in excess of the reported $ 1,075,000. Indeed, the answers by the corporations stated that in 1991, in connection with the preparation of the amended returns for the tax year ended July 31, 1988, petitioner Anthony Mitchell provided the preparer of the amended returns with: A statement by Anthony A. Mitchell to the effect that on April 13, 1988, he intended to and did in fact borrow one-half of that $ 700,000 check from petitioner and the other one-half of that $ 700,000 check from San Diego Coatings Company fully intending at that time to document these loans later, and simply forgetting to do so later and also forgetting to mention [sic] these two $ 350,000 loans to his wife; [Emphasis added.]
These answers were signed by petitioner Anthony A. Mitchell under penalties of perjury on March 18, 1993. In light of petitioner's answers to respondent's interrogatories, Mr. Palermo's testimony, the lack of corporate records reflecting the receipt or disposition of the $ 700,000, and the lapse of time from when Mrs. Mitchell claims to have told Mr. Palermo about the $ 700,000 and her testimony *275 at trial, we reject petitioners' argument that the failure to report the $ 700,000 was due to the error of their accountants. After receiving the $ 700,000 cashier's check, petitioner endorsed it over to a Mr. Adrian Hartman, who deposited it into a Swiss bank account. Petitioner testified that he met Mr. Hartman while on a cruise sponsored by the Howard Ruff Group, an organization that distributes monthly newsletters and sponsors seminars related to financial matters. Petitioner's testimony regarding this transaction was as follows: Q * * * What did you do with the $ 700,000 cashier's check that you received? A I bought Hambros funds. * * * Q Now, Hambros funds, what exactly are those? A Hambros funds are a -- they have a number of funds and they're like buying a stock. * * * * * * Q Okay. Now, what documents did you execute to purchase the Hambros funds, if any? A I don't believe there were any to purchase the Hambros funds. It was just a request. Q Did you actually receive the shares? A No. * * * Q Did you give them some kind of a power of attorney? A I really don't know. * * * Q And what type of account did you open with Foco Bank? *276 A Just an account. I don't know what type of account. * * * Q What information did you receive, if any, with respect to your investment in the Hambros shares, the Hambros fund? A None. Q How did you evaluate the performance of the fund? A Well, the London Times every day has a -- has a bid and ask price on all of the Hambros funds. * * * Q So you walked into the Foco Bank and surrendered to them a cashier's check in the amount of $ 700,000 and walked out of the bank with nothing in writing? A Exactly. I might state I trusted the fellow. He was aboard the cruise with us. He -- he had an office in Vancouver, and he was represented as a member of the Foco Bank. I didn't have any other thoughts.
Petitioner is an astute and successful businessman. We find it incredible that he would turn over $ 700,000 under these circumstances without receiving any record of the transaction. It is also implausible that for more than 3 years petitioner received no statements disclosing the activity of his account. On his 1988, 1989, and 1990 joint Federal income tax returns, petitioner affirmatively denied having an interest in a foreign account. Line 10 of Schedule *277 B of these returns was marked "No" indicating that petitioners had no foreign accounts. Petitioner argues that he never reviewed his returns, and that the reason line 10 was marked "No" was because his accountants assumed he had no foreign accounts. Petitioner's contentions are discredited by the fact that on a "systematizer" (also known as a "Tax Organizer") given to him by his accountants, he left blank the questions regarding foreign accounts. Petitioner's accountants used this systematizer to prepare his tax returns. We find the failure to fully cooperate with the revenue agent further evidences of petitioner's fraudulent intent. After receiving notice of respondent's examination, petitioner, as previously discussed, avoided disclosing the true sales price of the Cessna and avoided disclosing that he deposited the $ 700,000 into his Swiss bank account. Petitioner's behavior and his implausible explanations of that behavior depict a scheme intended to conceal, mislead, and prevent the collection of taxes. We find, therefore, that the underpayment of taxes for 1988 was due to petitioner's and the corporations' fraudulent intent to evade taxes known to be owing. Respondent *278 argues that the underpayment of tax on petitioners' 1988 return was also due to fraud by Mrs. Mitchell. While we find that respondent has met her burden as to petitioner and the corporations, we find that respondent has not proven by clear and convincing evidence that when Mrs. Mitchell signed and filed petitioners' 1988 return, she intended to evade taxes known to be owing. Petitioner, in his capacity as president of the corporations, signed answers to respondent's interrogatories stating that he did not "mentiom [sic] these two $ 350,000 loans to his wife". Respondent's arguments on brief accept this as true. Respondent argued: [Petitioner] did not tell [Mrs. Mitchell] that he had received a cashier's check payable to his order for $ 700,000.00 of the sales proceeds realized from the sale of the Airplane. [Citations omitted.] * * * As [petitioner] admits, he did not tell anyone, with a need to know, that he had received the $ 700,000. * * * * * * [Petitioner] forgot to tell his wife about the unrecorded and undocumented "loan" until sometime during [respondent's examination] * * * The other officers-directors-shareholders (including Mrs. Mitchell), knowing *279 nothing to the contrary, executed corporate minutes reflecting a total sales price which was understated by the $ 700,000 which Mr. Mitchell diverted to himself. [Citations omitted.] * * * Being in receipt of the funds, [petitioner] kept the true sale price a secret from those with a need to know, including Mrs. Mitchell. The upshot is that the $ 700,000 disappeared. It was not reflected in the corporate bank accounts, books, tax returns or financial statements. The absence of any paper trail linking Mr. Mitchell with $ 700,000 of diverted Corporate funds enabled him to use the money to generate tax free income. Considering these actions as a whole, tax evasion is the only plausible purpose he could have had for structuring the payment of the sales price in such a way as to guarantee that there would be no paper trail for the $ 700,000 which he received.
Based on the foregoing and the insufficiency of evidence to show that Mrs. Mitchell was aware of the $ 700,000 diversion when she signed the 1988 joint Federal income tax return, we find that respondent has not proven by clear and convincing evidence that Mrs. Mitchell intended to evade taxes known to be owing. [12]
*280 III. Section 6661 Substantial Understatement
The next issue for decision is whether petitioners are liable for the addition to tax under section 6661. [13]Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of tax. An understatement is substantial if it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. Sec. 6661(b). The amount of the understatement may be reduced under section 6661(b)(2)(B) for amounts adequately disclosed or supported by substantial authority. Respondent's determinations are presumed correct, and petitioners bear the burden of proving otherwise. Rule 142(a); Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337. Petitioners' understatement was substantial within the meaning of section *281 6661(b)(1)(A), and it was not adequately disclosed or supported by substantial authority. Petitioners argue that they are not liable for the section 6661 addition to tax since the $ 700,000 was a loan and not taxable income. We have already held that the $ 700,000 received by petitioners constituted constructive dividends. Accordingly, we sustain respondent's determinations regarding the section 6661 addition to tax. IV. Section 6621(c) Tax-Motivated Transactions
The final issue for decision is whether petitioners are liable for interest on substantial underpayments attributable to tax-motivated transactions. Section 6621(c) provides for an increased rate of interest on substantial underpayments attributable to tax-motivated transactions. Sec. 6621(c)(1). An underpayment is substantial, for purposes of this section, if it exceeds $ 1,000 and is attributable to 1 or more tax-motivated transactions. Sec. 6621(c)(2). Any sham or fraudulent transaction is considered a tax-motivated transaction. Sec. 6621(c)(3)(A)(v). As indicated by the foregoing, petitioners' entire underpayment is attributable to fraudulent transactions. Accordingly, we sustain respondent's determination. *282 Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Pro-Line Paint Co., docket No. 7560-92, and San Diego Coatings Co., docket No. 7561-92. The petitions for docket Nos. 7560-92 and 7561-92 were both captioned Pro-Line Paint Co. FKA San Diego Coatings Co. On July 31, 1990, Pro-Line Paint Co. merged into San Diego Coatings Co., which thereafter changed its name to Pro-Line Paint Co.↩
2. Petitioners held approximately 90 percent of the outstanding stock of San Diego Coatings Co. The remaining 10 percent was held by Joseph Mitchell (5%), Ernolff Soeterik (2.5%), and Frank Baptista (2.5%). Petitioner held 49 percent of the outstanding stock of Pro-Line Paint Co., and the remaining 51 percent was held by San Diego Coatings Co.↩
3. San Diego Coatings Co.'s officers and board of directors consisted of petitioner (president), Mr. Soeterik (vice president), and Mrs. Mitchell (secretary and chief financial officer).↩
4. Pro-Line Paint Co.'s officers and board of directors consisted of petitioner (president), Mr. Baptista (vice president), and Mrs. Mitchell (secretary and chief financial officer).↩
5. The $ 700,000 check paid directly to petitioner plus the $ 1,075,000 check exceeded the agreed upon purchase price by $ 25,000. Pro-Line Paint Co. refunded the excess $ 25,000 to Mr. Kay.↩
6. The difference between the $ 675,000 and the $ 700,000 received by petitioner is explained by the fact that initially Mr. Kay sent Pro-Line Paint Co. a check in the amount of $ 1,075,000 instead of $ 1,050,000, a difference of $ 25,000. See supra↩ note 5.
7. The only unreported income remaining in dispute is the $ 700,000 paid directly to petitioner, which respondent contends constitutes constructive dividends. On Jan. 31, 1993, petitioners reported interest of $ 11,875 and dividends of $ 30,340 earned from the Swiss bank account on their 1988 Form 1040X (Amended U.S. Individual Tax Return), which was received by the Internal Revenue Service Center in Fresno, California. On or about Oct. 19, 1991, the corporations reported their respective portions of the $ 675,000 proceeds as gain from the sale of the Cessna on their 1988 Forms 1120X (Amended U.S. Corporation Income Tax Return), which was received by the Internal Revenue Service Center in Fresno, California.↩
8. On July 31, 1990, Pro-Line Paint Co. merged into San Diego Coatings Co., which thereafter changed its name to Pro-Line Paint Co.↩
9. Messrs. Soeterik and Baptista testified that petitioner had requested authority to borrow $ 700,000. We are not persuaded by this testimony in light of the lack of conventional indicia of a loan, the fact that the $ 700,000 was never recorded in the corporate records, the proximity of the closure of the Swiss bank account to respondent's audit, the rather vague recollection of Messrs. Soeterik and Baptista regarding when events occurred, and the lapse of time between the purported authorization and Messrs. Soeterik and Baptista's testimony.↩
10. While these documents are captioned "Action of the Directors of Pro-Line Paint Company By Unanimous Written Consent", "Action of the Directors of San Diego Coatings Company By Unanimous Written Consent", Pro-Line Paint Co.'s minutes dated Oct. 8, 1991, describe them as "Minutes".↩
11. The documentation requested was: (1) A "Copy of the buyer's [Mr. Kay's] cancelled check including endorsement", (2) a "Copy of the bank statements showing the deposits made by Mr. Mitchell with the funds from the aircraft sale's proceeds", and (3) "Aircraft buyer's name, address and telephone number".↩
12. We recognize that Mrs. Mitchell testified that she knew of the $ 700,000 loan from the very beginning and that she told the accountant about the $ 700,000 loan. However, as previously explained, we do not believe her account of events surrounding her communications with the accountant.↩
13. On brief, the corporations admit liability for the sec. 6661↩ addition to tax.